MAND for further proceedings not inconsistent with this opinion.

**CITIZENS FOR A BETTER HENDERSON; Yellowrose Ltd., a limited partnership; Robert B. Branch and Stuart L. Podell, as general partners of said limited partnership; and City of Henderson, a municipal corporation. Nevada Wildlife Federation, Inc., an affiliate of the National Wildlife Federation, Plaintiffs-Appellants,**

v.

**Donald HODEL *, Secretary of the Interior, Robert Burford, Director of the Bureau of Land Management; Edward Sprang, Director of the Nevada State Office of the Bureau of Land Management; Ed Hastey, Director of the California State Office of the Bureau of Land Management; Roland G. Robinson, Director of the Utah State Office of the Bureau of Land Management, Robert Broadbent, Commissioner, Bureau of Reclamation; Intermountain Power Project; and City of Los Angeles, Defendants-Appellees.**

Nos. 84–2149, 84–2177.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 15, 1985.

Decided Aug. 13, 1985.

---

* Donald Hodel, current Secretary of the Interior, is substituted for James G. Watt, ex-Secretary of the Interior, pursuant to Fed.R.App.P. 43(c).

Shauna Hughes, Henderson, Nev., Elizabeth J. Foley, John P. Foley, Las Vegas, Nev., for Citizens for a Better Henderson, et al.

Arthur E. Gowran, Washington, D.C., Henry C. Thumann, O'Melveny & Myers, Los Angeles, Cal., for Hodel, et al.

Before GOODWIN, HUG and SCHROEDER, Circuit Judges.

GOODWIN, Circuit Judge.

Citizens for a Better Henderson, the City of Henderson and other plaintiffs (Henderson) appeal from dismissal of their action for injunctive and declaratory relief. Henderson sought to enjoin construction of a direct-current transmission line on multistory towers within the city limits. The case turns on the sufficiency of an environmental impact statement. We affirm.

The Intermountain Power Project (the Project) involves the construction of an electricity generating facility near Hanksville, Utah, and a transmission system to carry power from the generator to users in southern California and Utah. The part of the Project at issue in this case is a 490–mile direct-current transmission line from Utah to a converter station outside Los Angeles. Following the several-year preparation of the Project Environmental Impact Statement, which covered construction of both the generator and the transmission system, in December 1979 the Secretary of the Interior approved the transmission route challenged in this action. Most of the route crosses federal lands, over which the Bureau of Land Management has granted a right-of-way. Where the line crosses nonfederal property, the Project has generally been able to secure the appropriate routing permission from local authorities.

A small portion of the route goes through Henderson, Nevada. The original

path approved by the Secretary crossed nonfederal property within the municipal boundaries and lay approximately 130 feet east of an existing transmission line. In 1982, when Henderson refused to grant a conditional use permit to allow construction of the line on nonfederal land, the Project moved the line approximately 260 feet west, to a path which was still within the federally approved route but which, according to Bureau of Land Management records, was entirely over federal land.

On May 3, 1983, Henderson filed a complaint in federal district court for the District of Nevada against the Project, the Los Angeles Department of Water and Power (which is acting as the Project Manager) and the Secretary of the Interior. Henderson asked for injunctive and declaratory relief for alleged violations of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* and the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.* In September and October 1983, Henderson filed motions for a preliminary injunction and a temporary restraining order. Both were denied. After a two-month trial in 1984, Henderson's action was dismissed by a second judge.

Henderson urges four grounds for reversal. First, Henderson argues that the new route of the transmission line crosses nonfederal land, making it possible for the city to block construction for which no conditional use permit has been granted. Second, Henderson argues that even if the new route is entirely over federal land, the Project is required by the terms of the Bureau of Land Management right-of-way to comply with local land use requirements. Third, Henderson contends that the federal government has violated the Federal Land Policy and Management Act by informally designating the route through the City of Henderson as a corridor for power transmission lines. Henderson's final argument is that the Project Environmental Impact Statement did not adequately address alternative routes for the transmission line, or the potential health hazard of a right-of-way through Henderson.

## I. *The Transmission Line Crosses Only Federal Property.*

Henderson argues that the district court erred in concluding that within Henderson city limits the transmission line crosses only federal property. Henderson contends that the line crosses a small parcel of nonfederal land ("Section 27") and that private property is subject not to the federal right-of-way but to local land use controls. While the district court memorandum decision did not include a specific finding of federal ownership of the entire Henderson route, such a finding is implicit in its consideration of the preemption problem. We must affirm the district court determination on this fact question unless it is clearly erroneous. Fed.R.Civ.P. § 52(a); *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* — U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

The Project's evidence consisted of an affidavit by a Bureau of Land Management official about Bureau records, and a Bureau land status map. That evidence showed that Section 27 had been under federal jurisdiction, either continuously or since passage in 1976 of the Federal Land Policy and Management Act. Section 314 of that Act erased unpatented mining claims not renewed by 1979. 43 U.S.C. §§ 1744(a) and (c). On appeal the Project asserts that any patented mining claim to Section 27 would have resulted in permanent divestment of the government's title, and would have been recorded by the Bureau of Land Management. *See* 43 U.S.C. § 6.

Henderson's evidence, which consisted of testimony by the city's Director of Planning about conclusions he drew from county tax records, but not the records themselves, tended to show that Section 27 has also been for some years on the County assessor's tax rolls. However, Henderson did not offer proof of private title in the land, or demonstrate that a listing on county tax rolls was necessarily inconsistent with federal ownership.

■ It was the task of the trial judge and not this court to examine the Project's documentary evidence and weigh the credibility of the Bureau of Land Management affidavit against unsupported testimony of Henderson's witness. The evidence, although somewhat sparse on both sides, convinces us that the indicia of federal ownership offered by the Project were less ambiguous than the indicia of private ownership offered by Henderson, and that the judge's findings in favor of the Project on this question were not clearly erroneous.

## II. Local Law is Preempted.

Henderson next argues, in the alternative to its claim that Section 27 is privately owned, that even if the entire route is federally owned, the Project is nevertheless subject to Henderson's land use requirements, for two reasons. The first reason is that the Project is a private, not a federal, venture. The second reason is that the terms of the right-of-way mandate federal acquiescence with local restrictions. Neither argument withstands scrutiny.

We need not decide whether the Project is a federal undertaking. Even assuming it is not federal, there is no reason that the Secretary cannot authorize certain private Project activities, for example, construction of a transmission line on federal land. This court has supported the right of the federal government to exercise such authority, whether the authorized party is public or private, free of any regulatory interference by local agencies. *See Ventura County v. Gulf Oil Corp.,* 601 F.2d 1080, 1083 (9th Cir.1979), *aff'd,* 445 U.S. 947, 100 S.Ct. 1593, 63 L.Ed.2d 782 (1980) (authority given to government's lessee). *See also Federal Power Commission v. Idaho Power Co.,* 344 U.S. 17, 21, 73 S.Ct. 85, 87, 97 L.Ed. 15 (1952) ("the power of Congress over public lands ... is 'without limitation.' ").

■ The Secretary's authority to grant rights-of-way over federal land is found in § 501 of the Federal Land Policy and Management Act. 43 U.S.C. § 1761. Paragraph 15 of the right-of-way for this transmission line provides that the Project, as grantee, shall comply with applicable federal, state and local laws and "all regulations issued thereunder." Henderson reads this provision to give local zoning law priority over the federal right-of-way. Local law, however, can be considered applicable only to the extent it does not result in a land use which conflicts with the federally designated land use. *Kleppe v. New Mexico,* 426 U.S. 529, 543, 96 S.Ct. 2285, 2293, 49 L.Ed.2d 34 (1976); *United States v. City of Pittsburg,* 661 F.2d 783, 785 (9th Cir. 1981); *Ventura County,* 601 F.2d at 1083.

■ Occasionally, Congress specifically abdicates its control of public lands. Congress has done so in some respects with the statute in question here. For example, § 505 of the Federal Land Policy and Management Act, 43 U.S.C. § 1765(a)(iv), provides that every right-of-way must conform to state "siting, construction, operation, and maintenance" standards which are more stringent than equivalent federal standards. It does *not* specify subjugation to local zoning ordinances or plans. Absent a " 'clear congressional mandate' " that makes the intended preemption " 'clear and unambiguous,' " local regulation takes a back seat to applicable federal law. *See Hancock v. Train,* 426 U.S. 167, 179, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976) (citations omitted). A town regulation that prevents construction of transmission towers impermissibly conflicts with and must give way to the statutorily authorized granting of a federal right-of-way to host the towers.

## III. The Federal Land Policy Management Act claim was properly dismissed.

Section 503 of the Federal Land Policy Management Act, 43 U.S.C. § 1763, provides for the establishment of right-of-way corridors. Once a corridor has been designated by the Secretary, "each right-of-way or permit [for the corridor] shall reserve to the Secretary concerned the right to grant additional rights-of-way or permits for compatible uses on or adjacent to rights-of-way

granted pursuant to this Act." 43 U.S.C. § 1763. In effect, the granting of future rights-of-way along the same corridor is streamlined, virtually free of the environmental review process. However, designation of corridors, 43 C.F.R. § 2806.1, must be preceded by thorough study of environmental, economic and related concerns, 43 C.F.R. § 2806.2 and must follow specified procedures, 43 C.F.R. § 2806.2–1.

Throughout these proceedings, Henderson has asserted that the effect of placing this transmission line through the city, within 130 feet of an already existing line, is to designate informally the path of the two lines as a corridor. This contention was first addressed by the district court which denied the preliminary injunction. Based on the government's stipulation that it would not contest a finding that no corridor existed and concession that without a corridor designation each subsequent right-of-way would require a full panoply of environmental review, the district court refused to allow Henderson to proceed with discovery on the corridor issue. The judge confined the issue for trial to the adequacy of the Environmental Impact Statement with regard to the new transmission line.

■ When trial on the permanent injunction began, a different trial judge treated the earlier decision as a de facto dismissal of the § 503 claim and refused to allow Henderson to call witnesses or present evidence on the existence of a corridor. Henderson argues that the second judge's decision was also the equivalent of a dismissal, and contends that because defendants never actually moved before the second judge for a dismissal of the § 503 claim, Henderson never had a proper opportunity to oppose it. This argument is meritless. Henderson had at least three opportunities to convince the second district court that the § 503 issue was properly before it. The question was addressed in Henderson's trial brief, it was argued on the first day of trial, and briefed again after the trial. Henderson cannot complain that there was no hearing on the subject.

The record is clear that no formal corridor designation was attempted. Therefore, there is no issue before us concerning § 503, which provides the procedures for designation. Henderson's interest in preventing unauthorized rights-of-way is protected. The government has conceded that it will be unable to use the current rights-of-way for new rights-of-way without the proper review and approval process. Henderson would have us hold that rights-of-way cannot be placed together without formal corridor designation, but we have implied the opposite, *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 601 (9th Cir.1981), and we read no such restriction in the Secretary's regulations. *See* 43 C.F.R. § 2806.1(a). Therefore, there is no Federal Land Policy Management Act issue in this case.

IV. *Adequacy of the Environmental Impact Statement.*

■ The district court decision that the environmental impact statement was adequate can be reversed only if it was based upon a clearly erroneous finding of fact or an erroneous legal standard. *Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1460–61 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985); *Save Lake Washington v. Frank*, 641 F.2d 1330, 1334 (9th Cir.1981). The standard which the district court must apply is twofold. Under the Administrative Procedure Act, NEPA's procedural requirements must be observed. 5 U.S.C. § 706(2)(D). In addition, an environmental impact statement should accomplish its purpose, which is both to provide decision makers with enough information to "aid in the substantive decision whether to proceed with the project in light of its environmental consequence," and to provide the public with information and an opportunity to participate in gathering information. *See Trout Unlimited v. Morton*, 509 F.2d 1276, 1282–83 (9th Cir.1974); *Stop 3–H Ass'n*, 740 F.2d at 1461.

Without specifying how NEPA was violated, Henderson has alleged failure of pro-

cedural compliance with the statute. Henderson contends that preparation was rushed and the opportunity for public comment avoided or abbreviated, but does not describe or give authority for the time frame that should have been followed. Henderson has not demonstrated, and the record does not reveal, any concrete basis upon which the trial judge could have found that the procedural requirements of NEPA were not met.

Henderson's more urgent and complex argument is that the district court erred in finding the Environmental Impact Statement adequate with regard to its treatment of both the potential health hazard posed by the line and of the alternative routes for the line. We turn first to the district court review of the Environmental Impact Statement's treatment of alternative routes for the transmission line.

NEPA requires that an environmental impact statement provide information in detail on alternatives to the proposed action. 42 U.S.C. § 4332(2)(c). The Environmental Impact Statement in this case gave detailed consideration to ten alternative segments of the approved route. Not one of these segments resulted in a route which avoided Henderson. Henderson contends that another proposed route, referred to as the Owens Valley Alternative, is reasonable and should have been included in the Environmental Impact Statement. The Owens Valley Alternative takes an entirely different route from the approved route and thus avoids Henderson altogether. The district court received evidence and heard testimony offered by the Project that the Owens Valley Alternative was unreasonable because it would be significantly more costly and more environmentally destructive than the proposed route. The Project's position is that the Environmental Impact Statement need not have included a route so environmentally inferior to the preferred route that the only purpose of inclusion would be to make the reviewing agency look more favorably at the preferred route.

 In order to be adequate, an environmental impact statement must consid-er not every possible alternative, but every reasonable alternative. *Friends of Endangered Species v. Jantzen,* 760 F.2d 976, 988 (9th Cir.1985); *California v. Block,* 690 F.2d 753, 766–67 (9th Cir.1982); *Save Lake Washington,* 641 F.2d at 1334 (9th Cir. 1981). The existence of a viable but unexamined alternative renders an environmental impact statement inadequate. *Brooks v. Coleman,* 518 F.2d 17, 18 (9th Cir.1975). *See Missouri ex rel Ashcroft v. Dep't of the Army,* 672 F.2d 1297, 1303 (8th Cir. 1982). The question for the district court, therefore, was whether the Owens Valley Alternative was reasonable.

The district court did not make a specific finding on reasonableness. It concluded:

> The [c]ourt ... finds that the EIS could have set forth at greater length the possible or substitute alternative routes for the transmission lines but that the approved routing is so superior, environmentally and otherwise, to any possible substitute that the setting up of such substitutes would have been in effect setting up straw men to be knocked down and, [was] therefore, unnecessary.

 In the court's review, the superiority of the preferred route is irrelevant to the reasonableness of the omitted, alternative route. *See Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) (trial court should not substitute its judgment for that of the agency); *Block,* 690 F.2d at 761 (same). In this case, the trial judge undeniably made his own assessment of the routes. His failure to make a finding which focussed on the reasonableness question was error. It was not reversible error, however, when his conclusion is viewed in the context in which it was made. He had taken extensive, virtually uncontradicted testimony on the unreasonableness of the Owens Valley route. There is substantial evidence in the record for a finding that the Owens Valley route was not a reasonable alternative to the route through the City of Henderson. We would be elevating form over substance to send this case back for the trial judge to restate his findings in

approved language, reaching the same result.

We turn next to Henderson's argument that the Environmental Impact Statement did not correctly or adequately address potential health hazards to residents of Henderson. Health concerns were discussed only briefly and repetitively in the document. The district court concluded:

> The EIS should be detailed enough to adequately inform the decision-maker of the probable significant environmental impacts but need not discuss remote and highly speculative consequences, so a reasonably thorough discussion and [sic] of probable consequences is all that is required. Thus, the Court finds that the discussion of the health issues and impacts from the building of the transmission line have been adequately addressed.

■ The trial judge took extensive testimony and evidence on the existence of hazards. There is ample support in the record for a conclusion that no significant hazards exist. As with the discussion of alternatives, however, the trial judge's task was not to decide for himself whether the line posed a health hazard but to decide whether the Environmental Impact Statement provided adequate information to allow the Secretary reasonably to decide that question. *Block*, 690 F.2d at 761.

■ In this instance, the judge's findings were correctly limited to the adequacy of the discussion of health hazards. We are unable to tell from the district court's statement whether it was approving the document's generalized discussion of health hazards as applied to the entire 490–mile route, or whether it was focussed on the adequacy of the generalized discussion as it applied to the City of Henderson. Henderson's anxiety, of course, lies not with the health hazards posed in unpopulated areas but with the hazards posed in the nine or ten miles of the route which go through a largely undeveloped area that lies within Henderson's rapidly expanding city limits. Even if the district court approval was generalized, and not specific to

Henderson, we nonetheless hold that the Project Environmental Impact Statement is sufficiently specific.

The evidence shows that the route of the transmission line covers only sparsely populated areas. We include in this category the stretch of line through Henderson in which, within a half mile radius of the line, there is now an average of one house for each mile of line. (It is not clear from the record whether the houses were there when the Environmental Impact Statement was approved in 1979). The evidence also indicates that the level of environmental impact inflicted on humans by this kind of transmission system is not significantly harmful.

■ Under this circuit's rule of reason, the environmental impact statement need only provide as much information and detail as is necessary to provide a " 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " *Block*, 690 at F.2d at 761 (*quoting Trout Unlimited*, 509 F.2d at 1283). This Environmental Impact Statement would be a better, more informative document if it acknowledged that the remote possibilities of human harm which the line does pose are centered in Henderson. But Henderson has not demonstrated that evidence exists about the environmental impact of the line, the absence of which prevented the Secretary from making an informed, reasoned decision about the transmission line's effect on humans or on the City of Henderson in general. The transmission line may inhibit some future development, but it has not been shown to be a threat to health in respect to any present development.

■ Henderson's final contention with regard to the Environmental Impact Statement is that a new study is necessary to allow for inclusion of health hazard information recently made available and to include a report of Henderson's growth in the last decade. The significance of this new information is de minimis. Trial testimony and evidence indicated that studies

completed since the Environmental Impact Statement was approved in 1979 have not found any greater danger from direct-current lines than was known to exist before 1979. Moreover, no matter how much Henderson has grown since 1979, there are now no more than ten houses within the impact area of the transmission line. Because no new federal activity is proposed and the new material is not likely to affect the result reached in the old study, a new environmental impact statement is not necessary. *See* 40 C.F.R. § 1502.9(c)(1)(ii); *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024–25 (9th Cir.1980).

Affirmed.