**METHOW VALLEY CITIZENS COUNCIL, et al., Plaintiffs–Appellants,**

v.

**REGIONAL FORESTER, etc., et al., Defendants–Appellees.**

No. 86–4108.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 6, 1987.

Decided Dec. 1, 1987.

David A. Bricklin, Bricklin & Gendler, Seattle, Wash. (Molly Holt, Long Beach, Cal., on brief), for plaintiffs-appellants Methow Valley, Washington Environmental Council, and Sierra Club.

David C. Shilton, Dept. of Justice, Washington, D.C., for the federal appellees.

Glenn J. Amster, Hillis, Cairncross, Clark & Martin, Seattle, Wash., for defendant-appellee Methow Recreation, Inc.

---

* Honorable Albert Lee Stephens, Jr., Senior United States District Judge, Central District of California, sitting by designation.

Before GOODWIN and FERGUSON, Circuit Judges, and STEPHENS,* District Judge.

FERGUSON, Circuit Judge:

Sandy Butte overlooks the Methow Valley, an unspoiled, sparsely populated area on the eastern side of the North Cascade Mountains in the State of Washington. The Methow Valley provides critical winter range and migration corridors for Washington's largest migratory deer herd. Sandy Butte is a 3,900–acre parcel in the Okanogan National Forest. The upper one-third of Sandy Butte is entirely roadless. In 1978 appellee Methow Recreation, Inc. (MRI) applied for a "special use" permit to develop and operate a four-season destination ski resort on Sandy Butte and a large parcel of private land it had acquired adjacent to Sandy Butte. The proposed development is known as the Early Winters project. The project is expected to spawn extensive commercial and residential development in the Methow Valley.

Pursuant to requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, mandating completion of an Environmental Impact Statement (EIS) analyzing the environmental impacts of "major" governmental actions, the appellee Forest Service studied the question of whether it should allocate Sandy Butte for use as a downhill ski area. In 1982 the Forest Service published a draft EIS on a proposal to designate Sandy Butte for use as a major ski area capable of serving 8,200 skiers at one time (SAOT). The final EIS was issued in 1984. Based on its contents, in July 1984 the Regional Forester issued a "Record of Decision" which adopted a "future management plan" for Sandy Butte. The plan allocated the area for use as a ski area capable of serving 8,200 SAOT. The record of decision also approved the issuance of a special use permit to MRI for the Early Winters Project.[1]

1. A special use permit is necessary whenever a private party seeks to use lands owned by the federal government. The Forestry Service issues special use permits under authority derived from 16 U.S.C. § 497.

In December 1985, appellants Methow Valley Citizens Council, et al. (MVCC), brought this action in the District Court for the District of Oregon alleging violations of the National Forest Management Act, 16 U.S.C. §§ 1600–1614, the Clean Air Act, 42 U.S.C. §§ 7401–7626, and NEPA. Pursuant to local rule, the case was assigned to a United States Magistrate. The National Forest Management Act and Clean Air Act claims were dismissed upon motions for summary judgment and are not raised on appeal. The remaining NEPA issues were tried before the district court and the court affirmed the Forest Service's Record of Decision, dismissing the remaining claims. MVCC subsequently filed this appeal.

The issues facing this court are whether the district court erred in holding that the Regional Forester's decision to issue a special use permit is not reviewable and in its determination that the EIS adequately discussed alternatives to the proposed project, impacts to the deer herd, impacts on air quality, other significant impacts, and mitigation measures. Jurisdiction of this court is found under 28 U.S.C. § 1291.

## I.

The Administrative Procedure Act, 5 U.S.C. §§ 701–706, governs judicial review of agency actions. Section 702 grants standing to challenge an agency action to anyone adversely affected by such action, except where the statute under which the action was taken precludes judicial review, or where the action is committed to agency discretion by law. 5 U.S.C. § 701(a). While there is no claim here that judicial review is barred by statutory preclusion, there is dispute as to whether the Regional Forester's issuance of a special use permit is an action committed to agency discretion such that it is removed entirely from the scrutiny of judicial review. The district court held that it was committed to agency discretion and not subject to judicial review.

The district court cited two cases—*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971), and *Ness Investment Corp. v. United States Dept. of Agric., Forest Service,* 512 F.2d 706 (9th Cir.1975)—in support of its decision. In *Citizens to Preserve Overton Park,* the Supreme Court emphasized that action committed to agency discretion by law is "a very narrow exception ... applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" 401 U.S. at 410, 91 S.Ct. at 820 (citation omitted). In *Ness,* this court held that the denial of a special use permit was not judicially reviewable because there was no "law to apply" by which the court could assess the legality of the agency's decision. The court held that neither the authorizing statute, 16 U.S.C. § 497, nor the very general language of corresponding regulations, 36 C.F.R. § 251.1 et seq., offered standards by which the agency's action could be tested. *Id.* at 715, 716. *Contra Sabin v. Butz,* 515 F.2d 1061, 1065 (10th Cir.1975). Thus central to our decision in *Ness* was the lack of formal guidelines for the issuance of special use permits.

■ The district court failed to note, however, that in 1980—prior to the commencement of activities relevant to this action—the Forest Service issued detailed supplemental regulations which, while not entirely removing the decision to issue a special use permit from agency discretion, do impose specific obligations on the authority considering issuance. See 36 C.F.R. §§ 251.54–251.56. These guidelines, binding upon the Regional Forester when deciding whether to grant MRI its special use permit for development of the Sandy Butte area, constitute sufficient "law" for this court to apply to confer jurisdiction over the matter. *See Wallace v. Christensen,* 802 F.2d 1539, 1556 (9th Cir.1986) (en banc) (Hall, J., concurring).[2] Thus we hold

2. In *Wallace v. Christensen,* Judge Hall correctly noted that

[t]he inquiry into whether there are regulations which a court may look to in reviewing

an agency decision is a component of the section 701(a)(2) determination of whether a matter is committed to agency discretion by law ... If there are no statutory or regula-

that the Regional Forester's decision to issue a special use permit is subject to judicial review[3] where review involves an inquiry into whether the proper factors were considered by the Forestry Service. *See Save the Bay, Inc. v. Administrator of E.P.A.*, 556 F.2d 1282, 1295–96 (5th Cir. 1977).[4]

## II.

The National Environmental Policy Act, codified at 42 U.S.C. § 4332, provides in relevant part that when an EIS must be prepared—whenever a major government action is proposed—it must include

a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). Section 4332(2)(E) adds that all agencies of the Federal Government shall, to the fullest extent possible

study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

42 U.S.C. § 4332(2)(E).

There are two purposes served by preparation of an EIS. The statement should "provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences," *Trout Unlimited v. Morton*, 509 F.2d 1276, 1282 (9th Cir.1974), as well as "provide the public with information and an opportunity to participate in gathering information." *Citizens for A Better Henderson v. Hodel*, 768 F.2d 1051, 1056 (9th Cir.1985) (citations omitted).

An EIS aids the agency's own decision-making process by ensuring that the agency has before it " 'all possible approaches to a particular project ... which would alter the environmental impact and the cost-benefit balance.' " *State of Alaska v. Andrus*, 580 F.2d 465, 474 (D.C.Cir.), *vacated in part sub nom. Western Oil & Gas v. Alaska*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978) (quoting *Calvert Cliffs' Coordinating Committee v. AEC*, 449 F.2d 1109, 1114 (D.C.Cir.1971)).

tory directives then a court may conclude that the agency action at issue falls into that narrow class of cases in which there is no law to apply.
802 F.2d at 1556 (Hall, J., concurring) (citations omitted).

**3.** The magistrate stated that if he did have jurisdiction to review the Regional Forester's decision to issue the special use permit, then he believed that the decision was not arbitrary or capricious. However, an application for a special use permit must include "measures and plans for the protection and rehabilitation of the environment during construction, operation, maintenance, and termination of the project ...", 36 C.F.R. § 251.54(e)(4), and each special use authorization "shall contain ... [t]erms and conditions which will ... minimize damage to scenic and esthetic values and fish and wildlife habitat and othewise [sic] protect the environment". 36 C.F.R. § 251.56(a)(1)(ii). Thus the Code of Federal Regulations specifically requires the existence of, among other things, an

adequate mitigation plan. Since the mitigation "plan" here at issue is so vague and undeveloped as to be wholly inadequate, *see infra*, the Regional Forester's decision to grant the special use permit could be none other than arbitrary, capricious and an abuse of discretion.

**4.** *Save the Bay* involved a challenge to the issuance of a permit pursuant to authority granted under the National Pollution Discharge Elimination System, 33 U.S.C. § 1342. The Fifth Circuit considered whether it had jurisdiction in light of the statute's broad language explaining that "[o]nce the relevant factors are before the agency, it can weigh them within [its] broad mandate with an expertise to which the restraining powers of judicial review could add little." 556 F.2d at 1295. Nevertheless, the court held that "[j]udicial review, however, can quite easily be effective to assure that all those factors receive the agency's attention." *Id.* at 1296.

A.

■ The findings of fact underlying a lower court's decision on the adequacy of an EIS are reviewed for clear error. *Northwest Indian Cemetery Protective Ass'n v. Peterson,* 795 F.2d 688, 696 (9th Cir.1986), *cert. granted,* — U.S. ——, 107 S.Ct. 1971, 95 L.Ed.2d 812 (1987). "Interpretations of [environmental] regulations present questions of law, which are reviewable de novo." *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 493 (9th Cir.1987) (citing *Sierra Club v. Union Oil Co. of California,* 813 F.2d 1480, 1489 (9th Cir.1987)). "We review de novo the district court's determination of whether the EIS is reasonably thorough in discussing the significant aspects of the probable environmental impact of the proposed agency action." *Oregon Natural Resources Council v. Marsh,* 820 F.2d 1051, 1054 (9th Cir.1987) (citation omitted). This requires application of a "rule of reason" because a "reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies." *Kunzman,* 817 F.2d at 492. In other words, "whether a particular deficiency, or combination of deficiencies in an EIS is sufficient to warrant holding it legally inadequate, or constitutes merely a 'fly speck,' is essentially a legal question, reviewable de novo." *Id.* at 493.

### III.

To explain the obligations set forth in section 4332, provisions in the Code of Federal Regulations address, inter alia, the discussion of alternatives[5] and the discussion of the foreseeable environmental consequences of these various alternatives[6] which must be included in an EIS. "The detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action." *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982).

5. 40 C.F.R. § 1502.14.
6. 40 C.F.R. § 1502.16.
7. The Forest Service's final EIS listed four alternatives, including their preferred course of action, in addition to the alternative of "no action"

A.

■ To be adequate, an environmental impact statement must consider every reasonable alternative. *Friends of Endangered Species v. Jantzen,* 760 F.2d 976, 988 (9th Cir.1985); *California v. Block,* 690 F.2d at 766–67; *Adler v. Lewis,* 675 F.2d 1085, 1097 (9th Cir.1982) ("this court has held the alternatives discussion to be subject to 'reasonableness.'"); *Save Lake Washington v. Frank,* 641 F.2d 1330, 1334 (9th Cir.1981); *Lange v. Brinegar,* 625 F.2d 812, 818 (9th Cir.1980) ("The discussion of alternatives in an E.I.S. statement is subject to a construction of reasonableness."). An EIS is rendered inadequate by the existence of a viable but unexamined alternative. *Citizens for a Better Henderson,* 768 F.2d at 1057 (citations omitted). Furthermore, even if an alternative requires "legislative action", this fact "does not automatically justify excluding it from an EIS." *City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir.1986) (footnote omitted), *cert. denied,* — U.S. ——, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987). Thus, the range of alternatives considered must be sufficient to permit a reasoned choice. *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

■ Here the Forest Service's purpose—to provide a "winter sports opportunity"—is broadly framed in terms of service to the public benefit. It is not, *by its own terms,* tied to a specific parcel of land. *Compare City of Angoon,* 803 F.2d at 1021; *Trout Unlimited,* 509 F.2d at 1286. There appears no tenable reason for the Forest Service to be wedded exclusively to the development of Sandy Butte. Thus it should have appeared obvious that investigation was warranted to determine whether the development of winter sports opportunities could be pursued at alternative sites.[7]

mandated by statute. Yet all four of the "action" alternatives required development of Sandy Butte. No consideration was given in the EIS to ways of achieving the Forest Service's goal through other options, such as the expan-

Appellants have offered evidence suggesting that other sites may be well suited for the type of recreational development envisioned by the Forest Service. Unlike Sandy Butte, the sites discussed by the appellants are not adjacent to land owned by defendant MRI, but under the directive given to the Forest Service in its manual,[8] that fact does not preclude consideration of other reasonable alternatives. Moreover, since we find it reasonable to assume that expansion of existing ski areas would have less environmental impact than would the construction of an entirely new ski area,[9] while possibly achieving a comparable net increase in the total capacity of skiers served,[10] such alternatives might have been appropriate for investigation.

This court, however, would not require that the Forest Service explore an unreasonably broad range of alternatives. Rather, the range "need not extend beyond those [alternatives] reasonably related to the purposes of the project." *Trout Unlimited*, 509 F.2d at 1286 (citations omitted). Thus, the Forest Service should more clearly articulate its goal, specifically identifying the market and geographic pool of skiers targeted. This will provide a clear standard by which it can determine which alternatives are appropriate for investigation and consideration in its EIS. In its present state, the EIS's discussion of alternatives to the proposed action is inadequate as a matter of law.

**B.**

■ The district court held that the EIS adequately discussed the environmental impacts of the Early Winters project and its alternatives. We do not agree.

**1.**

The Magistrate's error resulted, in part, because he assumed that the law distinguished between primary and secondary impacts. Such a distinction would only confuse the issue. Rather, it is well established that NEPA and the Council on Environmental Quality guidelines require discussion of *all* significant impacts proximately caused by the proposed action—whether they, by convenience, are termed "primary" or "secondary". *See Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 783 (9th Cir.1980) ("so-called 'secondary' impacts are often as significant as 'primary' effects."); *Trout Unlimited*, 509 F.2d at 1238 n. 9 ("The central focus should not be on a primary/secondary impact analysis but upon those impacts (either primary or secondary) which have a 'significant impact' upon the environment."); *see also Environmental Defense Fund, Inc. v. Hoffman*, 566 F.2d 1060, 1067 (8th Cir. 1977).

This court would not require the government to speculate on impacts in order to "foresee the unforeseeable". *See City of*

---

sion of existing downhill ski areas in other parts of Washington State.

**8.** The manual provides in relevant part that

A permit shall not be granted simply to provide a commercial profit-making opportunity. The Forest Service is not required to accommodate a desire of an individual applicant. A real public service or other justification must be evident ... to show at least that the use meets a public need and will not conflict with National Forest objectives, programs or purposes.

Forest Service Manual § 2710.3.

**9.** In *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 778 (9th Cir.1980), the defendants intended to construct a new four-lane highway which would pass through parkland in plaintiffs' town. The EIS was held to be deficient because it failed to consider the alternative

of improving and widening a two-lane highway already in existence. This court stated that "the alternative ... was both reasonable and obvious, and that therefore the EIS is deficient.... The use of a narrower than four-lane road is made even more obvious by the possibility that parkland would thereby [be] spared." *Id.* at 784 (citations omitted). *See California v. Block*, 690 F.2d 753, 767 (9th Cir.1982) ("In the absence of an alternative that looks to already developed areas for future resource extraction and use, the ... decisional process ends its inquiry at the beginning.").

**10.** For example, one of the existing ski areas in Washington State has plans in motion to expand into a destination ski resort. A 1981 development report prepared for the Mission Ridge ski area details an intended expansion of the facility to accomodate an additional 3,900 SAOT, to make its total capacity 6,500 SAOT.

*Davis v. Coleman,* 521 F.2d 661, 676 (9th Cir.1975). However,

> [i]t must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry".

*Id.* at 676 (quoting *Scientists' Institute for Public Information v. A.E.C.,* 481 F.2d 1079, 1092 (D.C.Cir.1973)). Thus we find it imperative that the Forest Service evaluate the reasonably foreseeable significant effects which would be proximately caused by implementation of the proposed action. *Port of Astoria, Oregon v. Hodel,* 595 F.2d 467, 478 (9th Cir.1979) (EIS must address those reasonably likely consequences of a proposed development that would have an environmental impact).

### 2.

Plaintiffs argue that the development in the Methow Valley that is reasonably certain to follow development of Sandy Butte will cut off the deer herd's migration route, usurp fawning and staging areas and eliminate winter range—all of which are vital to the herd's survival. In contrast, the Forest Service believes that "with the implementation of mitigation measures" the impacts to the mule deer will be minor. This court fails to see the logic with which the Forest Service reaches this conclusion, since not only has the effectiveness of these mitigation measures not yet been assessed, but the mitigation measures themselves have yet to be developed.

Additionally, the Forest Service's own witness testified at trial as to the insufficiency of the data underlying the Service's conclusions in the EIS. He stated that the data was inadequate in terms of assessing the impacts of, for example, residential development reasonably certain to follow development of ski slopes on Sandy Butte.

The Forest Service is presently preparing a detailed and comprehensive study of the mule deer. However, just as the subsequent preparation of mitigation measures will not cure a deficient EIS, *see infra,* neither will a subsequent study providing information essential to assessment of the environmental impacts of a proposed action and its alternatives.

■ If a government agency has difficulty obtaining adequate information upon which to make a reasoned assessment of the environmental impacts of a course of action, it may not simply negate the existence of these impacts. Rather, it has an obligation to engage in what is called a "worst-case" analysis.[11] This is because "NEPA requires a 'worst case analysis' when 'the information relevant to adverse impacts is essential ... and is not known and the overall costs of obtaining it are exorbitant or ... the information ... is important and the means to obtain it are not known....'" *Friends of Endangered Species,* 760 F.2d at 988 (quoting *Save our Ecosystems v. Clark,* 747 F.2d 1240, 1243 (9th Cir.1984)).

> The purpose of the analysis is to carry out NEPA's mandate for full disclosure to the public of the potential consequences of agency decisions, and to cause agencies to consider those potential consequences when acting on the basis of scientific uncertainties or gaps in available information. The analysis is formulated on the basis of available information, using reasonable projections of the worst possible consequences of a proposed action.

*Save our Ecosystems,* 747 F.2d at 1244–45 (quoting 46 Fed.Reg. 18032 (1981)); *see Or-*

---

**11.** The worst case analysis requirement was codified in 1979, 40 C.F.R. § 1502.22, and rescinded in 1986. This rescission, however, does not nullify the requirement, *Marsh,* 820 F.2d at 1058 n. 8, since the regulation was merely a codification of prior NEPA caselaw. *See Southern*

*Oregon Citizens Against Toxic Sprays, Inc. v. Clark,* 720 F.2d 1475, 1478 (9th Cir.1983), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 446, 83 L.Ed.2d 372 (1984); *see also Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1244 (9th Cir.1984).

*egon Natural Resources Council,* 820 F.2d at 1059.

 An absence of critical information renders it impossible for the Forest Service to make a reasoned decision in the disposition of a special use permit application. The EIS's cursory discussion of the impacts to the mule deer herd, based on incomplete information, is inadequate as a matter of law. If the Forest Service finds that the new comprehensive study of the mule deer still provides incomplete information, a worst-case analysis would be required for the areas in which information is lacking.[12]

3.

Appellants also contend that the district court erred in its assessment of the adequacy of the EIS's discussion of impacts on air quality.

a.

 The Pasayten Wilderness has been designated a "Class I" area by Congress. This means that its air is so unpolluted as to require heightened protection. Appellants believe that pollution in the Methow Valley proximately caused by the proposed development of Sandy Butte will significantly deteriorate the quality in the Pasayten Wilderness and that this was not revealed in the EIS. Appellees contend, and the district court held, that the EIS's discussion of air quality impacts to the Pasayten Wilderness is adequate. We disagree.

The EIS concluded that no Class I area would be impacted by the proposed action.

In reaching this conclusion the government relied on data that was based upon an estimate of the difference in elevation between the floor of the Methow Valley and the lowest portion of the ridge separating the Methow Valley from the Pasayten Wilderness—an estimate that has since been shown to be *egregiously incorrect.* This error casts significant doubt on the assumption that the ridge forms a physical barrier that would prevent air pollution trapped beneath the inversion layer in Methow Valley from entering the wilderness area. · Incorrect assumptions usually lead to incorrect conclusions. Thus the district court's conclusion, that the information relied upon by the government in preparation of the relevant section of the EIS was adequate, is clearly erroneous. The Forest Service must reassess the impacts upon the Pasayten Wilderness.

b.

 Appellees acknowledge that without effective mitigation measures, the state standards for Total Suspended Particulates will be exceeded in nearly all of the areas of the upper Methow Valley as a result of foreseeable growth and development stimulated by the Early Winters project. This, presumably, is why the Regional Forester in his Record of Decision approving the special use permit application required that an air quality management program be developed. However, we interpret NEPA and section 497 as requiring this type of inquiry and analysis *before* a permit application can be approved.[13]

---

12. A district court has held that "[w]ithout accurate evidence of the effectiveness of ... mitigation techniques, the Forest Service must prepare a worst case analysis." *Nat'l. Wildlife Federation v. United States Forest Service,* 592 F.Supp. 931, 943 (D.Oreg.1984). This court expresses no opinion as to whether a worst case analysis is necessarily required in the absence of an evaluation of the effectiveness of mitigation measures. However, we do recognize the inherent limitation on a decisionmaker's ability to make a reasoned decision as to the environmental impacts of a proposed action where information contained in an EIS is incomplete or inaccurate.

13. Appellants have made two additional arguments relating to air quality which merit atten-

tion. First, they argue that the development of Sandy Butte and the growth it will spur will likely expend the degradation increment available for this area under the federal Prevention of Significant Deterioration program. They suggest that the government is required to include in its EIS an assessment of how this exhaustion of the increment will limit opportunities for future commercial development in the Methow Valley. We disagree. "[A]ssuming compliance [with federally established maximum threshold levels of pollution], growth management decisions were left by Congress for resolution by the states." *Alabama Power Co. v. Costle,* 636 F.2d 323, 364 (D.C.Cir.1979).

Second, appellants argue that the EIS is inadequate as a matter of law because it did not

## C.

Section 4332 of NEPA requires that "action be taken to mitigate the adverse effects of major federal actions." *Stop H–3 Ass'n v. Brinegar*, 389 F.Supp. 1102, 1111 (D. Hawaii 1974), *rev'd on other grounds*, 533 F.2d 434 (9th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976). Thus an agency cannot decide to "act now and deal with the environmental consequences later." *North American Wild Sheep v. United States Dept. of Agric.*, 681 F.2d 1172, 1181 (9th Cir.1982). Consequently, an EIS must include a thorough discussion of measures to mitigate the adverse environmental impacts of a proposed action. *Oregon Natural Resources Council v. Marsh*, 820 F.2d 1051, 1055 (9th Cir.1987). "A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA." *Northwest Indian*, 795 F.2d at 697. "Moreover, the EIS must analyze the mitigation measures in detail and explain the effectiveness of the measures." 820 F.2d at 1055; *see Northwest Indian*, 795 F.2d at 697. And we note that the subsequent preparation of an elaborate mitigation plan "would not absolve a failure to prepare an adequate EIS." *Trout Unlimited*, 509 F.2d at 1284.

 Provisions of the Code of Federal Regulations governing the award of special use permits impose an affirmative duty on the appellees to develop the necessary mitigation measures *before* the permit is granted.[14] Similarly, the EIS must also contain a detailed explanation of the specific measures which will be employed to mitigate the adverse impacts of a proposed action. 40 C.F.R. §§ 1502.14(f), 1502.16(h).

 The Forest Service's EIS contains scattered pages in which they enumerate possible mitigation measures and identify mitigation goals that would be necessary to prevent excessive adverse impacts. These various discussions, however, are presented in very general terms, lacking both a detailed description of required or possible mitigation measures, and any analysis as to the effectiveness of these measures.

The Forest Service argues that further specificity as to the mitigation measures for on-site impacts can only be provided when the permittee presents a master plan of development. The Forest Service also maintains that they have satisfied the mitigation discussion requirement for another reason. In its EIS, there is a brief discussion of measures that *could be* required by local government to mitigate off-site impacts. Pursuant to this discussion, the Forest Service executed a Memorandum of Understanding (MOU) with Okanogan County, the Washington Department of Ecology, and the Environmental Protection Agency. In very general terms, the MOU identifies mitigation tasks and assigns responsibilities to various parties.

It is true that contractual obligations to insure the mitigation of adverse environmental consequences may not be a prerequisite to a statutorily adequate EIS. *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 860 (9th Cir.1982) (When efforts to mitigate the adverse environmental effects are "to be undertaken by third parties, their commitments, while they need not be contractual, must be more than mere vague statements of good intentions.") (citation omitted). However, the MOU offers no assurance whatsoever that the vague miti-

---

discuss the foreseeable significant carbon monoxide emissions from wood stoves. While the precise amount of air quality degradation that would result from these emissions is not entirely clear, given that even the highest estimate places the impact at still far below the applicable national standard, this omission is probably not sufficient to render the EIS inadequate. However, since a new EIS must be prepared, inclusion of an analysis of carbon monoxide emissions produced by wood stoves would assist the decisionmaker in making a fully informed decision.

**14.** The relevant section provides that

Each special use authorization shall contain: (1) Terms and conditions which will ... (ii) minimize damage to scenic and esthetic values and fish and wildlife habitat and othewise [sic] protect the environment; ... and (2) such terms and conditions as the authorized officer deems necessary to ... (vi) require siting to cause least damage to the environment, taking into consideration feasibility and other relevant factors ...

36 C.F.R. § 251.56(a).

gation objectives it features—performance of almost all of which would be the responsibility of third parties to the permit process—would ever in fact be achieved or even that effective measures would ever be designed (let alone implemented), if the Early Winters development were to proceed. *Cf. Preservation Coalition,* 667 F.2d at 860 ("Since many of the 'mitigations' proposed by the agency were ... potential actions to be taken by [third parties] reliance on them ... was improper.") (footnote omitted).

As this court recently stated in *Oregon Natural Resources Council v. Marsh,*

> [t]he importance of the mitigation plan cannot be overestimated. It is a determinative factor in evaluating the adequacy of an environmental impact statement. Without a complete mitigation plan, the decisionmaker is unable to make an informed judgment as to the environmental impact of the project—one of the main purposes of an environmental impact statement.

820 F.2d at 1055 (citation omitted). The EIS's discussion of mitigation measures is inadequate as a matter of law.

## IV.

The decision of the district court is reversed and remanded for entry of appropriate relief in accordance with this opinion.