Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

'ILIO'ULAOKALANI COALITION, a
Hawaii nonprofit corporation;
NA'IMI PONO, a Hawaii
unincorporated association;
KIPUKA, a Hawaii unincorporated
association,
              *Plaintiffs-Appellants,*

              v.                              No. 05-15915

DONALD H. RUMSFELD, Secretary of               D.C. No.
Defense; FRANCIS J. HARVEY, Dr.,            CV-04-00502-DAE
Secretary of the United States
Department of the Army,                        OPINION
              *Defendants-Appellees,*

              and

LES BROWNLEE, Acting Secretary
of the United States Department of
the Army,
              *Defendant.*

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

Argued and Submitted
December 6, 2005—San Francisco, California

Filed October 5, 2006

Before: Betty B. Fletcher, David R. Thompson, and
Carlos T. Bea, Circuit Judges.

17449

Opinion by Judge B. Fletcher;
Dissent by Judge Bea

**COUNSEL**

David L. Henkin, Earthjustice, Honolulu, Hawaii, argued the case for appellants ‘Ilio‘ulaokalani, Na ‘Imi Pono, and Kipuka; Isaac H. Moriwake was on the briefs for the appellants.

Michael T. Gray, Department of Justice, Washington, D.C., argued the case for appellees Donald H. Rumsfeld, Secretary of Defense and Francis J. Harvey, Secretary of the United States Department of the Army; Kelly A. Johnson, Acting Assistant Attorney General, John L. Smelzer, Department of Justice, and Barry A. Weiner, Department of Justice, were on the briefs for the appellees.

**OPINION**

B. FLETCHER, Circuit Judge:

This appeal requires us to assess whether the Army complied with the National Environmental Policy Act of 1969

("NEPA"), 42 U.S.C. §§ 4321-4347 (2006), in planning its programs to modernize and streamline its forces, while simultaneously maintaining readiness. While the metamorphosis of the Army and the strategic planning accompanying this transformation is the business of the Army, not the courts, the Army's compliance with NEPA does involve us.

As part of its NEPA evaluation of the Army Transformation Campaign Plan, the Army completed a programmatic environmental impact statement ("PEIS"), in which it identified Hawaii as one of the selected sites for transformation. Subsequently, the Army undertook a site-specific environmental impact statement ("SEIS") to detail the impacts on the environment of the Army's expansion, land use, and activities associated with transforming the 2nd Brigade, now stationed on Oahu, Hawaii, into a Stryker Brigade Combat Team ("SBCT") in Hawaii. Plaintiffs, ʻIlioʻulaokalani Coalition, Na ʻImi Pono, and Kipuka ("Hawaiian Groups"), challenged the sufficiency of the Army's NEPA procedure, both at the programmatic and site-specific levels, on two grounds, arguing that (1) the Army failed to comply with NEPA's public notice requirements and (2) both the PEIS and SEIS failed to consider reasonable alternatives.

The district court granted summary judgment to the Army, finding that its public notice efforts were compliant with NEPA and that it sufficiently considered reasonable alternatives to transforming the 2nd Brigade in Hawaii. We now reverse the portion of the district court's decision that held that the Army considered all reasonable alternatives to transformation of the 2nd Brigade in Hawaii and remand to require it to prepare a supplemental SEIS to consider all reasonable alternatives, most notably the potential for transforming the 2nd Brigade outside of Hawaii.

## I.   Background

### A.   The Army's Planned Transformation

In 1999, the Secretary of the Army and the Chief of Staff of the Army announced a major re-working of the United States Army. The objective of this effort is the creation of a "more responsive, deployable, agile, versatile, lethal, survivable, and sustainable" Army which is also strategically responsive and nimble. Programmatic Record of Decision ("P-ROD") (Apr. 2002) at 1, AR 0009656. The Army describes the "ultimate force that would achieve the Army Vision" as the "Objective Force." Final Programmatic Environmental Impact Statement ("Final PEIS") (Feb. 2002) at 1-1, AR 0003864.

This thirty-year undertaking will have three phases (Initial Phase, Interim Capability Phase, and Objective Capability Phase) and three corresponding objectives (Initial Force, Interim Force, and Objective Force). P-ROD at 1-2, AR 0009656-57. The Initial Phase, which began in October 1999 and had been completed at the time of this appeal, had as its objective the creation of two Initial Brigade Combat Teams ("BCTs"). Two units, the 3rd Brigade, 2nd Infantry Division and the 1st Brigade, 25th Infantry Division, in Fort Lewis, Washington, were transformed to accomplish this objective. U.S. Army Public Affairs Office, Press Release, Army Announces Locations of Next Interim Brigade Combat Teams (July 12, 2001), AR 0003512. The purpose of this Initial Phase was to "validate an organizational and operational model for Interim BCTs [Brigade Combat Teams]" and to "develop[ ] the strategic, operational, and tactical doctrine for subsequent phases of transformation." Final PEIS at 2-5, AR 0003878. "These brigades . . . are being used to evaluate and refine the Operations and Organization Concept for a brigade combat team (BCT) and to validate tactics, techniques, and procedures." P-ROD at 2, AR 0009657.

The Interim Capability Phase, aspects of which are at issue in the appeals before us, has as its objective "complet[ing] the fielding of five to eight Interim BCTs." The Interim Force would consist of "both Legacy Forces and transformed forces." Final PEIS at 2-5, AR 0003878. These BCTs will be capable of deploying anywhere in the world in four days. *Id.* at 1-1, AR 0003864. This phase will begin "with fielding of interim armored vehicles (IAVs) and will end when the last I[nterim ]BCT is fully manned, equipped, and trained to possess the capabilities described in the I[nterim ]BCT Operations and Organization Concept." P-ROD at 2, AR 0009657. The Objective Phase will complete the Army's transformation into the Objective Force described above. *Id.* at 1-2, AR 0009656-57.

Both cases decided today[1] address issues that arose as part of the Interim Capability Phase, namely the transformation of 2nd Brigade in Hawaii into an Interim or Stryker BCT. We present and view the facts in the light most favorable to Plaintiffs-Appellants Hawaiian Groups as this is an appeal from the grant of summary judgment to appellees and denial of summary judgment to appellants. *See Envtl. Coal. of Ojai v. Brown*, 72 F.3d 1411, 1414 (9th Cir. 1995).

## B.   Programmatic Environmental Impact Statement

On December 15, 2000, the Army published in the *Federal Register* its notice of intent ("NOI") to prepare a PEIS for its planned overhaul. 65 Fed. Reg. 78476 (Dec. 15, 2000). At this point, the Initial Phase was already underway in Fort Lewis, Washington. *Id.* The NOI described the alternatives that would be considered in the PEIS:

---

[1]The other case, *United States v. 1,402 Acres of Land, et al.*, No. 05-15858, concerns the Army's acquisition of land to serve its transformation of the 2nd Brigade. That case is disposed of in a separate memorandum disposition.

1. No Action Alternative: Whereby the ATCP would not be implemented and needed changes to Army equipment, force structure and training practices would be separately analyzed on a piecemeal basis.

2. Action Alternative 1: Whereby the program for transformation of the Army to better meet present and future national security requirements and fulfill the Army Vision would be initiated in accordance with the ATCP including:

   a. A comparison of the likely environmental effects at candidate (alternative) sites for placement of the brigades planned for the Interim Force.

   b. Identification and analysis of the types of major actions contained in the ATCP leading to the Objective Force and their associated activities and consequential types and magnitude of effects.

3. Action Alternative 2: Whereby the ATCP would only be partially implemented because of budgetary or other constraints.

*Id.*

To further publicize the scoping period for the PEIS, the Army published a notice in USA TODAY on December 19, 2000. A large title reads, "PUBLIC NOTICE." In slightly smaller font is a subheading stating, "THE DEPARTMENT OF THE ARMY SEEKS PUBLIC INPUT FOR PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT FOR IMPLEMENTATION OF THE ARMY TRANSFORMATION CAMPAIGN PLAN." AR 0004167. Below that, in small type, the notice indicates that the Army is seeking public comment to determine the "appropriate scope of its Programmatic Environmental Impact Statement" and summarizes

the alternatives to be considered as the "no-action" alternative, "full implementation of the TCP," and "partial implementation of the TCP." *Id.* That the Army provided notice of the pending PEIS in the *Federal Register* and in USA TODAY, not in the Hawaiian media, is not in dispute. The Army did not invite state and local agencies to participate in scoping for the PEIS. The Army noted internally that there was "[v]irtually no public response to 'scoping.' " Dep't of the Army Transformation Office, Public Involvement and Outreach for Army Transformation and the Transformation PEIS, slide presentation, AR 0004584.

Consistent with its practices during scoping, the Army published a Notice of Availability of the Draft PEIS for Implementation of Army Transformation in the *Federal Register*, 66 Fed. Reg. 54241 (Oct. 26, 2001), and in USA TODAY on October 31, 2001, making the Draft PEIS available for public comment. AR 0004593, 00010390-91. Again, the Army did not circulate the Draft PEIS to, and did not solicit comments from, state or local agencies. Neither did the Army provide written notice to national organizations or solicit comments from potentially interested individuals and communities. Plaintiffs did not comment on the Draft PEIS. According to Plaintiffs and confirmed by the Army's distribution list, no one in Hawaii sought copies of the Draft PEIS. Nationally, one member of the public submitted comments on the Draft PEIS. Pls.-Appellants' Opening Br. at 22-23. The Draft PEIS described how the transformation of certain brigades into Stryker Brigade Combat Teams ("SBCTs") would take place during the second phase, the Interim Capability Phase, of the Army's overhaul. The Draft PEIS identified the 2nd Brigade stationed in Hawaii as one of the units that would undergo transformation during the Interim Phase.[2] Draft Programmatic Environmental Impact Statement (Oct. 2001) ("Draft PEIS"),

---

[2]While the Army's formal announcement that the 2nd Brigade would be included in the Interim Phase came in July 2001, the 2nd Brigade had been selected, at least tentatively, before scoping for the PEIS began.

at 2-9, AR 0003597. The *Federal Register* and USA TODAY announcements did not contain any information that Hawaii would be affected by the planned transformation. Pls.-Appellants' Opening Br. at 22.

The Army's Final PEIS, issued in February 2002, considered the no action alternative but, in summarizing its consideration of other alternatives, noted that "maintenance of forces status quo would impair the Army's ability to maintain its commitment to the Nation and fulfill the Army Vision." Final PEIS at 2-9, AR 0003882. The Final PEIS considered only two alternatives, the no-action alternative and full implementation of the Army's Transformation Plan. *Id.* at ES-2, AR 0003847. The Final PEIS determined that the preferred alternative is full implementation of the proposed Army Transformation Plan. The Final PEIS also indicated that the Army expected to conduct transformation of existing units "in place," rather than re-locating them. *Id.* at 4-3, AR 0004000. The 2nd Brigade remained a target for Interim Phase transformation. Fed. Appellees' Resp. Br. at 11. The Army signed the Record of Decision ("ROD") for the PEIS, proceeding with its preferred alternative and finalized designation of the 2nd Brigade for conversion to an Interim BCT, contingent upon a site-specific EIS. P-ROD at 1, 10, AR 0009656, 0009665.

The Army's own experts recognized the shortcomings of the PEIS and its ROD not long after they were published. The minutes of an internal June 2002 meeting preparing for the SEIS indicate that "the PEIS does not contain specific language about why each of the five sites was selected." After Action Report from the Army Interim Force NEPA Process Coordination Meeting (June 4-5, 2002) ("After Action Report"), at 3, AR 0088102. According to this document, the Army "did know what the sites were and why they were selected, but didn't want that detailed information to go into the PEIS." *Id.* Because the five sites for Interim Phase transformation are in the ROD, "the main issue now is that the ROD has no supporting analysis in the PEIS." *Id.* The Army's

experts recognized this as a "potential deficiency." *Id.* "In both Alaska and Hawaii, the question has arisen as to why the Army picked these sites." *Id.*

As to the alternatives considered by the PEIS, at a legal issues forum documented in the minutes, in response to the question whether the SEIS should look at other locations for the selected units, Army attorneys responded that the PEIS foreclosed consideration of other locations:

> unless the local situation suggests that it may be impossible to train where they are now. The PEIS leaves us short on alternatives. The only alternatives we have are no action versus action. The P&N [purpose and need] statements are crafted so tightly that we may be restricting ourselves too much. The PEIS only looked at one alternative.

*Id.* at 5-6, AR 0088104-05.

In response to questions of whether it is "reasonable for the public to ask why on the siting issue," attorneys responded: "Yes; the ROD makes a decision that is not based on any analysis. Installations need a position paper on why the sites were picked, so that we have an administrative record of the decision that can be referenced." *Id.* at 6, AR 0088105. When asked about whether the programmatic ROD can be fixed, attorneys responded: "The only alternatives are to have HQDA [Headquarters] bear the burden or have the installations bear it. Installations will probably have to drive on." *Id.*

### C.  Site-Specific Environmental Impact Statement

The Army then undertook a SEIS for the 2nd Brigade's transformation in Hawaii, starting scoping by notifying and inviting comment from a breadth of Hawaiian organizations, including civic organizations, veteran groups, retired military officials, state and city government officials, members of

Congress, and neighborhood boards. The Army also reached out to groups representing low-income, minority and Native Hawaiian constituencies. Final Site-Specific Environmental Impact Statement, Transformation of the 2nd Brigade, 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii (May 2004) ("Final SEIS"), at 1-8, 1-9, AR 0051279-80. After the publication of the NOI in the Federal Register, the Army published notices in all major newspapers in Oahu and Hawaii on April 8, 2002, announcing scoping meetings. The Army held seven scoping meetings between April 16 and 30, 2002, five on Oahu and two on the island of Hawaii. The meetings on Hawaii are not at issue here. At the scoping meetings on Oahu, 100 oral comments were received from individuals and organizations. The Army also received written comments from 199 individuals and organizations, 21 comments through its website, 7 comments by telephone, and 77 comments at additional information meetings requested by organizations. Final SEIS at 1-9, AR 0051280.

The SEIS considered three alternatives, the no-action alternative, the reduced land acquisition alternative, and the proposed action. Record of Decision, Transformation of the 2nd Brigade, 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii (July 2004) ("S-ROD"), at 7-8, AR 0010317-18. The proposed action consists of converting the 2nd Brigade into a SBCT on Oahu. The reduced land acquisition alternative is identical to the proposed action, except for decreased land acquisition at the South Range Acquisition Area ("SRAA"). *Id.* at 8, AR 0010318. In response to public questions as to why alternatives outside of Hawaii were not considered, the Army responded that the decision to transform the 2nd Brigade in place had been made in the PEIS. The Final SEIS issued on May 28, 2004; the ROD followed on July 7, 2004 and recommitted to transforming the 2nd Brigade in Hawaii.

### D.   Procedural History

Plaintiffs-Appellants challenged the Army's SEIS. On October 12, 2004, the district court entered the parties' stipu-

lated agreement that the Army would not proceed with conversion of the 2nd Brigade until after the district court ruled on Plaintiffs' motion for a preliminary injunction. The district court denied that motion on November 5, 2004. Pls.-Appellants' Opening Br. at 12. Plaintiffs then amended their complaint to challenge the Army's notice and comment efforts for the PEIS on January 4, 2005. On cross motions for summary judgment, the district court denied Plaintiffs' motion and granted Defendants' motion. Judgment was entered for the Army on April 29, 2005. Plaintiffs timely appealed the district court's grant of summary judgment. This court denied Plaintiffs' motion for an injunction pending this appeal and expedited briefing and our hearing of this appeal. *Id.* at 13.

## II.  Waiver

The district court held that Plaintiffs were barred from arguing the insufficiency of the alternatives considered in the PEIS because they had not submitted comments to the Army during the PEIS process. *‘Ilio‘ulaokalani Coalition v. Rumsfeld*, 369 F. Supp. 2d 1246, 1253 (D. Haw. 2005). The district court found that "[w]ithout the benefit of such comments, the Army did not have the opportunity to respond with an explanation or address Plaintiffs' concerns at the proper point in the process." *Id.* The district court rested its holding on *Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004), and *Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991). *See id.* The district court held that the Army's publication of the Notice of Availability ("NOA") of the draft PEIS in the Federal Register "informed the public that it was soliciting input on its proposal to transform, and that the Army-wide transformation would include Hawaii."[3] *Id.* "Absent exceptional cir-

---

[3]The district court cites *Gov't of Guam v. United States*, 744 F.2d 699, 701 (9th Cir. 1984), for the principle that publication in the Federal Register constitutes formal notice. *See id.* While this may generally prove true, its applicability is highly questionable in a case where another statute, in this case NEPA, provides specific, additional notice requirements and where Plaintiffs allege that those notice requirements were not met.

cumstances," stated the district court, "Plaintiffs' allegations cannot now serve as a basis to overturn the Army's decision." *Id.* Following the rationale of *Havasupai Tribe*, the court found no exceptional circumstances.

In applying the *Vermont Yankee* doctrine, we find clear distinctions from *Havasupai Tribe* and *Public Citizen*. In *Vermont Yankee*, Plaintiffs challenged the Atomic Agency Commission's decision to grant an operating license to a nuclear power plant. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Defense Council*, 435 U.S. 519 (1978). During the public comment process, plaintiffs submitted comments on the draft EIS but did not participate in subsequent fact-finding hearings as to the content of their comments concerning energy conservation. The Supreme Court held that it is "incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Id.* at 553. In *Havasupai Tribe*, where this court applied the *Vermont Yankee* doctrine, the plaintiff failed to raise its claims during the public comment period, despite the fact that its comments were specifically solicited. 943 F.2d at 33. A similar factual situation arose in *Public Citizen*. Although the plaintiff organization submitted comments, those comments did not urge the agency to consider the alternatives that it later raised in its claim that the EIS was insufficient. *Public Citizen*, 541 U.S. at 764-65.

This court has drawn a distinction between situations in which NEPA plaintiffs submitted comments that did not alert the agency to their concerns or failed to participate when the agency looked into their concerns and situations in which plaintiffs allege procedural violations of NEPA. *See Kunaknana v. Clark*, 742 F.2d 1145, 1148 (9th Cir. 1984) ("The rationale of *Vermont Yankee* has been applied in those instances in which an interested party suggests that certain factors be included in the agency analysis but later refuses the agency's request for assistance in exploring that party's con-

tentions."). This court has declined to adopt "a broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision." *Id.*

In *Northwestern Environmental Defense Center v. Bonneville Power Administration*, 117 F.3d 1520, 1535 (9th Cir. 1997), we explicitly distinguished between claims based on procedural violations and situations like *Vermont Yankee* and *Havasupai Tribe* that "involved the failure to raise a specific factual contention regarding the substantive content of an EIS during the NEPA public comment process." Although the *Bonneville Power* case dealt with the Northwest Power Act, that act is analogous to NEPA in that it "governs the public comment process." *Id.*

[1] Although we do not overrule the district court's denial of summary judgment to Appellants on their claim that the Army did not satisfy NEPA's notice requirements,[4] such a holding is not necessary to underlie our determination that Plaintiffs have not waived their opportunity to challenge the range of alternatives considered in the PEIS. *Kunaknana*, 742 F.2d at 1148. The Supreme Court in *Public Citizen* reminds us of the rule that the primary responsibility for NEPA compliance is with the agency: "the agency bears the primary responsibility to ensure that it complies with NEPA, and an EA's or EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." 541 U.S. at 765 (internal citation omitted). Our court's holding in *Friends of Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000), sheds light on how to interpret this "so obvious" standard. In that case, we held that an EIS was inadequate where the agency had independent knowledge of the issues that concerned Plaintiffs. *Id.* at 558-59. The record in this case is

---

[4]That is not to say that the Army was wise in deciding to avoid notification of potentially interested Hawaiian entities.

replete with evidence that the Army recognized the specific shortfall of the PEIS raised by Plaintiffs here: the failure to support the determination to transform the 2nd Brigade in place. *See* Dep't of the Army Envtl. Law Div., Internal Army Comments on the Preliminary Draft PEIS for Army Transformation (May 7, 2001) ("Comments on Draft PEIS"), at 1-6 (Comments of Paul Martin, NEPA Compliance Coordinator for the Army's Envtl. Ctr., Comments of Timothy Julius, Office of the Dir. of Envtl. Programs), AR 0004465-66, 0004476-79; Email from Scott Farley, AR 0004486-88; After Action Report at 1-6, AR 0088100-05. The Army had independent knowledge of the very issue that concerns Plaintiffs in this case, such that "there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Public Citizen*, 541 U.S. at 765. Plaintiffs have not waived their right to challenge the sufficiency of the Army's consideration of reasonable alternatives.

### III. Consideration of Reasonable Alternatives under NEPA

Strategic planning and the Army's metamorphosis are the Army's business, not the courts'. What involves us, however, is NEPA's requirement that the Army prepare an EIS to examine what effects any plans will have on the environment (the extreme example would be a plan for nuclear testing that would require extensive analysis). Here, the Army assumes that it has an obligation to comply with NEPA. That is not at issue. At issue is whether its compliance was adequate.

### A. NEPA

The National Environmental Policy Act of 1969, commonly known as NEPA, "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2006). The regulations implementing NEPA have developed procedures to "insure that environmental information is available to public officials and citizens before decisions are made and

before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

**[2]** Congress passed NEPA "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005). "NEPA requires that a federal agency consider every significant aspect of the environmental impact of a proposed action . . . [and] inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (internal quotation marks and citations omitted). "[T]o accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Id*. NEPA does not, however, mandate any substantive outcome. *Lands Council*, 395 F.3d at 1026. Under NEPA, all federal agencies, including the Army, must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). That EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

## B.   Standard of Review

We review *de novo* the district court's summary judgment in appellees' favor. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004). In so doing, we must view the evidence in the light most favorable to Appellants and determine whether there are any genuine issues of material fact and whether the district court correctly applied

the substantive law. *Envtl. Coal. of Ojai*, 72 F.3d at 1414. An agency decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In reviewing the sufficiency of an EIS, we employ "a rule of reason" standard of review "that inquires whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (internal quotation marks and citation omitted). This "rule of reason" standard is not materially different from arbitrary and capricious review. *Lands Council*, 395 F.3d at 1026 n.5. "We make a pragmatic judgment whether the [Environmental Impact Statement's] form, content and preparation foster both informed decision-making and informed public participation." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150-51 (9th Cir. 1997) (citing *Block*, 690 F.2d at 761) (internal quotation marks omitted). To discharge our duty, we must be satisfied that the agency has taken a "hard look" at the environmental consequences of a decision. *Id.* at 1151.

## C.   The Army's NEPA Process

The Army adopted a "tiered" approach to its compliance with NEPA, preparing a programmatic EIS followed by a site-specific EIS. NEPA regulations encourage agencies to "tier" their environmental impact statements in some situations. *See* 40 C.F.R. § 1502.20.

> "Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrat-

> ing solely on the issues specific to statement subsequently prepared.

*Id.* § 1508.28.

Tiering is "encouraged . . . to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." *Id.* § 1502.20. Here, where the agency is moving from "a program, plan, or policy environmental impact statement to . . . a site-specific statement or analysis," *id.* § 1508.28(a), tiering is appropriate.

In the context of national forest management, we defined the programmatic stage as the level "at which the [agency] develops alternative management scenarios responsive to public concerns, analyzes the costs, benefits and consequences of each alternative in an environmental impact statement ("EIS"), and adopts an amendable forest plan to guide management of multiple use resources." *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 923 n.2 (9th Cir. 1999). Following the programmatic stage is the "implementation stage during which individual site specific projects, consistent with the forest plan, are proposed and assessed." *Id.* A programmatic EIS must provide "sufficient detail to foster informed decision-making," but an agency need not fully evaluate site-specific impacts "until a critical decision has been made to act on site development." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003) (quoting *N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890-91 (9th Cir. 1992) (quotation marks omitted)).

The Army's PEIS reached a deeper level of specificity than is usual in that it named several specific units that will transform in the Interim Phase and indicated that such transformation will take place "on-site." Although the PEIS names the 2nd Brigade in Hawaii as one of these units set for transformation on-site, it does not undertake any analysis of the envi-

ronmental impacts associated with that transformation. Following its PEIS, which designated the 2nd Brigade in Hawaii as one the units to be transformed and committed to on-site transformation, the Army undertook a SEIS for the Hawaii transformation of that unit. Based on the PEIS's determination that transformation of the 2nd Brigade was to take place in Hawaii on Oahu, the SEIS considered three alternatives, all of which involved transformation of the 2nd Brigade in Hawaii on Oahu — the proposed action, a reduced-land-acquisition alternative, and a no-action alternative. Appellants argue that the Army's tiered NEPA analysis failed to consider reasonable alternatives, particularly the transformation of the 2nd Brigade outside of Hawaii.

## D.   Where the Army Went Wrong

[3] An EIS must describe and analyze alternatives to the proposed action. Indeed, the alternatives analysis section is the heart of the environmental impact statement. The agency must look at every reasonable alternative within the range dictated by the nature and scope of the proposal. The existence of reasonable but unexamined alternatives renders an EIS inadequate.

*Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998) (internal citations and quotation marks omitted); *see* 40 C.F.R. § 1502.14 (stating that consideration of alternatives is the "heart of the environmental impact statement."); *Methow Valley Citizens Council v. Regional Forrester*, 833 F.2d 810, 815 (9th Cir. 1987) (noting that "an environmental impact statement must consider every reasonable alternative" and that "the range of alternatives must be sufficient to permit a reasoned choice."), *rev'd on other grounds*, 490 U.S. 332 (1989), *aff'd on remand*, 879 F.2d 705 (9th Cir. 1989).

### 1.  The PEIS: Selecting the 2nd Brigade

**[4]** We first consider whether the Army should have undertaken analysis of the impacts of transforming the 2nd Brigade in Hawaii in the PEIS. *California v. Block*, 690 F.2d 753 (9th Cir. 1982), sets the foundation for our review of the PEIS's consideration of alternatives. It guides the determination of when site-specific analysis must occur where there is a programmatic EIS:

> The detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action. The standards normally applied to assess an EIS require further refinement when a largely programmatic EIS is reviewed. The critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur. NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process. This requirement is tempered, though, by the statutory command that we focus upon a proposal's parameters as the agency defines them. The requirement is further tempered by the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences. When a programmatic EIS has already been prepared, we have held that site-specific impacts need not be fully evaluated until a "critical decision" has been made to act on site development. This threshold is reached when, as a practical matter, the agency proposes to make an "irreversible and irretrievable commitment of the availability of resources" to a project at a particular site.

*Id.* at 761 (internal citations omitted).

**[5]** The agency's challenge and ours is to find the right balance between the efficiency benefits of tiering, described in 40 C.F.R. § 1502.20, deference to the agency's definition of the purpose and need of the proposed action, and the recognition that the PEIS constrains future decision-making and must therefore analyze alternatives in sufficient detail to prevent foreclosure of options with insufficient consideration. *Id.* at 762-63.

Appellants argue that the PEIS made the decision to commit resources to a particular site — the transformation of the 2nd Brigade in Hawaii. The Army counters that it did not commit to transform the 2nd Brigade until the issuance of the SEIS ROD, and that even though the PEIS identified the 2nd Brigade as targeted for transformation during the Interim Phase, the Army reserved judgment until completion of the SEIS. Fed. Appellees' Resp. Br. at 32. The comments of the Army's own experts indicate otherwise.

**[6]** The minutes of a June 2002 post-PEIS, pre-SEIS Army planning meeting indicate that the Army's own experts recognized that the decision to commit resources to transformation of the 2nd Brigade in place was made during the PEIS and therefore that site-specific analysis should have been undertaken in the PEIS. The conclusions articulated in the PEIS ROD as to in-place transformation of the 2nd Brigade had little support in the document and no analysis of alternative sites, requiring the SEIS to provide analysis supporting a decision made in the PEIS. Paul Martin, of the U.S. Army Environmental Center, commented on the draft PEIS:

> Interim Force considerations are ripe for reasonably detailed analysis. . . . Interim Force development is an imminent proposal requiring a near term decision and commitment of Army resources that will have on the ground impacts within the next five to eight years. . . . Paragraph screams that the Army plans to make a Major [sic] resource allocation decision on

the Interim Force without consideration of alternatives.

Comments on Draft PEIS at 4, AR 0004465.

In addition, the SEIS explicitly ruled out consideration of alternatives that stationed the 2nd Brigade outside of Hawaii on the grounds that this would be inconsistent with the PEIS. Once the PEIS was issued, there was no longer a question of whether the 2nd Brigade would transform in Hawaii, only a matter of how.

Appellees also argue that all Army units are scheduled to transform under the thirty-year plan and therefore that the 2nd Brigade is no different from any other Brigade in terms of the Army's decision to transform in-place. Fed. Appellees' Resp. Br. at 35. The problem with this argument is that the 2nd Brigade is scheduled to transform much sooner than most other Brigades — the site-specific plans for the 2nd Brigade are more crystallized than those for the brigades that will not undergo transformation until the Final Phase.

The Army's own experts realized that the Army made site-specific decisions in the PEIS without analysis of their impacts or consideration of reasonable alternatives, as required by NEPA. Despite this, the Army argues that it was appropriate to defer analysis until the SEIS, using the principles of "tiering" as its crutch. The Army settled on transformation of the 2nd Brigade in Hawaii in the PEIS; however, it reached this decision with no analysis of the environmental impacts or of reasonable alternatives to such a transformation. While there is nothing per se improper about reaching these decisions at the programmatic stage, it is improper to do so without undertaking the analysis required by NEPA when those decisions are made.

2.   The SEIS

Without having considered alternatives to transformation of the 2nd Brigade in Hawaii in the PEIS, the Army had an obli-

gation to consider such alternatives in the SEIS. The Army argues that the scope of reasonable alternatives to be considered in the SEIS was bound or limited by the PEIS's decision to transform in Hawaii as articulated in the SEIS purpose and need statement.

The way the Army would have it, it was neither required to examine alternatives to transformation in Hawaii in the PEIS (because the site-specific threshold had not yet been crossed) nor in the SEIS (because on-site transformation of the 2nd Brigade was mandated by the PEIS as articulated in the SEIS purpose and need statement). The Army can't have it both ways. Either it needed to explain in the PEIS its decision to transform the 2nd Brigade in Hawaii and consider reasonable alternatives in the PEIS or it needed to explain that decision in the SEIS, but the Army cannot simultaneously argue that the decision had been made in the PEIS and that it had not. Somewhere, the Army must undertake site-specific analysis, including consideration of reasonable alternatives.

3.   Reasonable Alternatives

[7] The scope of reasonable alternatives that an agency must consider is shaped by the purpose and need statement articulated by that agency. The Army must consider all reasonable alternatives within the purpose and need it has defined. *See Nw. Coalition for Alternatives to Pesticides (NCAP) v. Lyng*, 844 F.2d 588, 592 (9th Cir. 1988) ("[I]t is the scope of the program that influences any determination of what alternatives are viable and reasonable."). Appellants ask us to find that the Army defined the purpose and need statement in the SEIS too narrowly.[5] We do not see that as the

_____

[5]Appellants rely on the principle that while an agency has the discretion to define the purpose and need of a project, it may not "define its objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea*, 123 F.3d at 1155. Appellants note internal Army commentary before the SEIS was undertaken in support of their argument that the Army defined its objec-

problem. What is missing is the consideration of alternate ways to accomplish its stated mission. The Army states its mission as follows: "to enable the Army to achieve the force characteristics articulated in the Army Vision in the most timely and efficient manner possible and without compromising readiness and responsiveness. . . . Transformation is needed to address the changing circumstances of the 21st Century." Final PEIS at 1-2, AR 0003865. It then leaps to the assumption that transformation in Hawaii or no action are the only alternatives. This is where the impermissible "narrowing" takes place. The Army violated NEPA by not considering alternatives that include transformation of the 2nd Brigade outside of Hawaii.[6]

---

tives too narrowly in the PEIS. "The PEIS leaves us short on alternatives. The only alternatives we have are no action versus action. The P&N statements are crafted so tightly that we may be restricting ourselves too much." After Action Report at 5-6, AR 00088104-05. Paul Martin indicates that the framing of the transformation "has foreclosed any rational consideration of alternatives, . . . to meet the stated purpose and need." Comments on Draft PEIS at 1, AR 0004478. Timothy Julius commented that the "EIS is woefully inadequate: The alternatives are meaningless. Where is the 'analysis' of installations as initiated in the NOI? . . . The decision provides no starting point or analysis that would be useful to installations. Based on this document, the Army is forcing the installations to individually justify transformation." AR 0004485. In addition to describing how the Army's framing provides no real alternatives for consideration, Julius' comments also drive home the fact that the Army's approach here was backwards: rather than making its site decisions with full information about the impacts of choosing those sites, the Army made its site decisions and asked the installations to justify those decisions in their site-specific EISs.

These comments, as we see them, simply highlight the Army's failure to consider reasonable alternatives in either the PEIS or the SEIS.

[6]The Army argues that the PEIS limits its framing of the SEIS's purpose and need to transforming the 2nd Brigade in Hawaii. This argument assumes that the Army made this very decision in the PEIS (i.e., transformation of the 2nd Brigade in Hawaii) in a manner consistent with its obligations under NEPA. We reject this assumption and find that the Army erred by making unsupported site-specific determinations. The Army's reliance on "tiering" is unhelpful to its claims.

**[8]** The issue we consider is whether transformation of the 2nd Brigade *outside* of Hawaii is a reasonable alternative in the context of the Army's purpose and need: "to enable the Army to achieve the force characteristics articulated in the Army Vision in the most timely and efficient manner possible and without compromising readiness and responsiveness." *Id.* This purpose "is not, *by its own terms*, tied to a specific parcel of land," *Methow Valley*, 833 F.2d at 815, indicating that transformation outside of Hawaii is a reasonable alternative. Our sister circuit has held that "[w]hen the proposed action [here the transformation of the 2nd Brigade] is an integral part of a coordinated plan to deal with a broad problem, the range of alternatives that must be evaluated is broadened." *City of Alexandria v. Slater*, 198 F.3d 862, 868 (D.C. Cir. 1999) (quoting *Natural Res. Defense Council v. Morton*, 458 F.2d 827, 835 (D.C. Cir. 1972)) (quotation marks omitted). Between the purpose articulated in the PEIS and that articulated in the SEIS, the Army made the decision to require transformation of the 2nd Brigade in Hawaii. This decision was never explained or justified and foreclosed alternatives that could have been consistent with the Army's stated mission.

Furthermore, the record is unambiguous — compelling our finding that transformation of the 2nd Brigade outside of Hawaii was a reasonable alternative that the Army was required to consider under NEPA. First, the Army's own experts recognized that the failure to undertake this analysis in the PEIS created a problem under NEPA — an unsupported conclusion needing to be justified in the SEIS was a backdoor path avoiding analysis. Second, the Army had already started transformation of other west-coast brigades, including two in Ft. Lewis, Washington, an alternative location where transformation of the 2nd Brigade could happen at potentially lower cost to the environment, and another brigade, the 2nd Calvary from Louisiana, which was moved for its transformation.

a.   Internal Acknowledgment of the Need to Consider Off-island Transformation

The record is replete with expressions of concern that the Army never explained its decision to not consider alternatives involving transforming the 2nd Brigade outside of Hawaii. Army personnel and Hawaiians both sought an answer to the question, "Why Hawaii?" *See* After Action Report at 1, 3, AR 0088100, 0088102. This concern about incomplete information underpinning the decision to transform in Hawaii was raised within the Army during the PEIS process and in preparation for the SEIS, and by the public during scoping for the site-specific EIS.

From the outset, Army staff expressed concern about the scope of the PEIS and its failure to explain siting decisions. *See supra* note 5 (reviewers noted in May 2001 that the framing of the transformation "foreclosed any rational consideration of alternatives, . . . to meet the stated purpose and need," AR 0004478, the PEIS was "woefully inadequate," "[t]he alternatives meaningless," and "the Army is forcing the installations to individually justify transformation," AR 0004485.).

The PEIS never responded to these concerns. Following the completion of the PEIS and in preparation for the SEIS, Army staff comments revealed that "[t]he PEIS leaves us short on alternatives. The only alternatives we have are no action versus action. The P&N statements are crafted so tightly that we may be restricting ourselves too much." After Action Report at 5-6, AR 0088104-05. The minutes of that meeting read:

> A major issue that surfaced during group discussion was the fact that the PEIS does not contain specific language about why each of the five sites was selected. It would have been helpful to have it there so that each site could refer to the PEIS when queried about reasons for selection. . . . the main issue

> now is that the ROD has no supporting analysis in
> the PEIS.

*Id.* at 3, AR 0088102.

Lieutenant Colonel Kozlowski noted that it should be up to the Major Army Commands to explain the siting decisions in their specific EISs — the Headquarters of the Department of the Army ("HQDA") should have done that. He thought that these questions should be answered by Headquarters outside of the PEIS in a supplemental EIS. *Id.*

In a question and answer session at this meeting, in response to a question asking whether it would be better for Army Headquarters to develop a unified purpose and need statement for each location chosen to transform, Major Army Command attorneys responded:

> The PEIS is what it is, as is the ROD. HQDA can't effectively supplement those documents, and that will be a potential weakness. However, *it does give installations the right to look at different training site alternatives.* LTC Kozlowski will take the issue to the G-3, who will probably put together a task force to correct *the mistake of not addressing location selections in the PEIS.*

*Id.* at 5, AR 0088104 (emphasis added).

In response to a question about whether it is "reasonable for the public to ask why on the siting issue," the same attorneys answered:

> Yes; the ROD makes a decision that is not based on any analysis. Installations need a position paper on why the sites were picked, so that we have an administrative record of the decision that can be referenced. . . . either HQDA has to revise the ROD to

> address the issue or installations will have to look at
> stationing alternatives. . . . The only alternatives are
> to have HQDA bear the burden or have the installa-
> tions bear it. Installations will probably have to drive
> on.

*Id.* at 6, AR 0088105.

### b.   The Army's Rationale for Not Analyzing Alternatives

The Army now argues that the record demonstrates that
transformation of the 2nd Brigade in Hawaii is of strategic
importance, that transformation in Hawaii is critical for the
training of soldiers in "conditions that would arise in expected
combat situations," and therefore that transforming outside of
Hawaii is not a reasonable alternative. Final SEIS at 1-4, AR
0051275. This argument is undermined by the record. The
SEIS purpose and need statement offers three factors to
explain why the 2nd Brigade was chosen to transform into a
Stryker Brigade: (1) location of the 2nd Brigade within the
strategically important Pacific Rim; (2) the terrain and condi-
tions in Hawaii which most closely approximate those likely
to be found in the Pacific Rim; (3) proximity to major air-
bases and seaports makes deployment easier. Unfortunately
for the Army, however, the SEIS does not support its own
purpose and need statement, or a finding that transformation
of the 2nd Brigade in Hawaii is the only reasonable alterna-
tive. This finding is undermined by evidence developed in the
SEIS.

### (1)   Location in the Pacific Rim and Proximity to Airbases and Seaports

[9] As the SEIS's Statement of Need points out, other loca-
tions in the United States with proximity to the Pacific Rim
have been designated for early transformation: "There are two
other SBCTs on the Pacific coast of the continental United
States (Alaska and Washington) to support deployment to the

critically important Pacific Rim . . . .” Final SEIS at 1-5, AR 0051576. Nothing in the record distinguishes Hawaii from Alaska or Washington.

Transformation of brigades at Fort Lewis, Washington was part of the Initial Phase of Army Transformation. The Army had already started transformation of these other west-coast brigades, creating alternative locations where transformation of the 2nd Brigade could happen at potentially less detriment to the environment. Furthermore, it is clear that the Army knew that it had the authority to consider moving the 2nd Brigade to Washington or Alaska for transformation. *See* Dep’t of the Army, Strategic Envtl. Assessment for Army Transformation, Initial Report (Nov. 17, 2000), at 30, AR 0005547 (listing “[r]e-stationing of brigades to take advantage of training assets and opportunities” as a “type[ ] of proposal[ ] that must be considered” in NEPA analysis.). For example, the Army moved another brigade, the 2nd Armored Cavalry Regiment from Louisiana to Fort Lewis for its transformation into a Stryker Brigade Combat Team. *See* Press Release, Joint Readiness Training Center and Fort Polk Public Affairs Office, Fort Polk to Receive New Infantry Brigade Combat Team (July 23, 2004), AR 0009561. Thus, the Army’s argument that Hawaii is close to the Pacific Rim and has access to seaports and airbases does not answer the question, “Why Hawaii?”

(2)   The Importance of Hawaii’s Terrain and Conditions

The Army also argues that Hawaii’s unique terrain and conditions mandate transformation in Hawaii. At oral argument and in subsequent supplemental briefing, Appellees focused our attention on their argument that Hawaii’s terrain is unique in the United States and most closely approximates tropical terrain in the Pacific Rim and elsewhere in the world. The Army cites a 1997 study on Installation Training Capacity by Army Headquarters, which notes that “[t]raining areas on Oahu, Hawaii are unique in the Army’s training land

inventory. They are the only mountainous jungle setting." HQDA, Training Directorate, Office of the Dep. Chief of Staff for Operations and Plans, Installation Training Capacity (ITC) Phase 1 Study Report (Dec. 31, 1997), at 11, AR 0002886. These documents refer to the Kawailoa Training Area ("KLOA") on Oahu.

KLOA consists of 23,348 acres on the western slope of the Ko'olau Mountain Range, of which 5,310 acres are suitable for maneuver training activities. Final SEIS at 7-14, 7-15, AR 0051956-57. "KLOA can support small infantry unit maneuvers and helicopter. The remaining land is considered unsuitable for maneuver training, but can support mountain and jungle warfare training. In these areas, troop deployment is limited to single file, small unit movement on ridgelines." *Id.* at 7-15, AR 00551957. Based on this statement in the SEIS, Appellee argues that the Army's assertion that Hawaii offers unique training areas for the 2nd Brigade once it has been transformed into a Stryker Brigade is "fully consistent with the actual training terrain available."

[10] While the Army may be correct that KLOA provides unique and important mountainous jungle terrain for a light infantry unit, the Army has failed to account for the fact that no Stryker training is proposed for KLOA. In fact, KLOA cannot support Stryker vehicles and is unsuitable for Stryker Brigade training. Stryker vehicles are eight-wheeled, 23-foot long, 9-foot wide, 20-ton combat vehicles. Final SEIS at 2-33, AR 0051318. While the actual vehicle employed by the SBCT "may vary from the current Stryker vehicles as the system is developed," it "overall will have the same characteristics as the current Stryker." *Id.* "Because of the limitations of the Stryker, most mounted movement takes places on roads or unrestricted terrain." *Id.* at 2-40, AR 0051325. The SEIS indicates that not a single acre of KLOA is maneuver-acreage for mounted Stryker training. Stryker vehicles would only be appropriate in KLOA along Drum Road in transit to other locations. *Id.* at 2-37, AR 0051322. Stryker training focuses

on "[u]rban operations training" and will employ "new urban warfare facilities." *Id.* at 2-36, AR 0051321.

At the time that the Army noted the unique training that KLOA's mountainous jungle terrain would provide the Army, Stryker brigades did not yet exist. The SEIS indicates that, while that jungle terrain may be unique and important for light infantry brigades like the current 2nd Brigade, KLOA cannot support Stryker vehicles, and no mounted training is envisioned or possible there. The fact that Oahu has jungle terrain does not alone justify the elimination of alternatives involving transformation of the 2nd Brigade outside of Hawaii.

**[11]** Ultimately, the question raised by the Army's own experts during the PEIS process and following the publication of the ROD based on the PEIS, and by the public in the scoping process for SEIS — "Why Hawaii?" — was never answered. Transformation of the 2nd Brigade outside of Hawaii was a reasonable alternative that the Army was obligated under NEPA to consider. Its failure to do so renders the Army's EISs inadequate. *See Friends of Southeast's Future*, 153 F.3d at 1065.

### E.   Remedy

If we were to accede to the Army's assertion that its statement of purpose and need, including its site-selection, cannot be challenged, the concept of tiered EISs is meaningless. An agency could avoid consideration of reasonable alternatives by making a binding site-specific decision at the programmatic stage without analysis, deferring consideration of site-specific issues to a SEIS. Then at the SEIS stage, the agency simply could point back to the analysis-free decision at the programmatic stage, as the Army has done here, and find that the scope of its site-specific analysis is constrained by the PEIS. The SEIS would merely operate to justify a decision made analysis-free at a previous stage.

**[12]** The result: the Army never undertakes any analysis of alternatives to Hawaii. What is the cure? We conclude that the practical solution is to remand, requiring the preparation of a supplemental SEIS. There is no magic as to which EIS is the vehicle for site-specific analysis. It would have been perfectly appropriate for the PEIS to forgo any decision as to specific sites, leaving the analysis and recommendations to the SEIS. The Army's mistake here was to commit to the transformation of the 2nd Brigade in Hawaii without considering alternatives in either the PEIS or the SEIS.

We conclude that this can now be done most appropriately in a supplemental SEIS. As the Army's pre-SEIS, June 2002 meeting indicates, the failure of Army Headquarters to explain its decision at the programmatic phase requires each separate installation to consider a broader range of alternatives in its SEIS than would otherwise have been required. Therefore, we reverse and remand for supplemental analysis of alternative locations in a supplemental SEIS.

**AFFIRMED IN PART, REVERSED IN PART. REMANDED.**

**Volume 2 of 2**

BEA, Circuit Judge, dissenting:

This case questions whether a court can second-guess the Army when it decides that modernizing its brigade units as quickly as possible, while maintaining combat readiness, can be done only "in place," i.e., at each brigade's present base location. In the name of environmental "concerns,"[1] the majority would require the Army to consider what it has already reasonably rejected: whether it should consider moving Army units around the country for the new training— regardless it would cause delay in modernizing, lack of combat-readiness and entail prohibitive costs—because of possible environmental impacts training "in place" could cause.

I respectfully dissent. The purpose and need of the Army's overall transformation is to modernize its brigade units as quickly and efficiently as possible, while maintaining combat readiness. To further that purpose and need, the Army reasonably decided such transformation would proceed "in place." Not only have plaintiffs failed to raise any challenge to the Army's purpose and need of quick transformation while maintaining combat readiness, they have also failed to challenge "in place" transformation as arbitrary and capricious. I would find that plaintiffs have failed to argue their only tenable ground for relief: that the Army improperly ruled out relo-

---

[1] I place the word in quotes because it may have acquired a special meaning in the context of environmental litigation. Where other litigants have "objections," environmental groups seem to have "concerns." This may imply the "concerned" possess a greater commitment, sensitivity and objectivity. Nonetheless, for our purposes, to have effect in litigation, "concerns," like objections, must be voiced and justified, or be lost by doctrines of waiver and exhaustion of administrative remedies.

cation of brigades as an alternative to "in place" transformation. But in fact, the decision by the Army to transform units "in place" was reasonable and is entitled to deference.

To add insult to injury, the majority would allow plaintiffs to be the vehicle for this second guessing even though the plaintiffs raised no objections or "concerns" on the issue of alternate locations for transformation in the agency proceedings which preceded this action. In so doing, the majority aims to strengthen NEPA compliance by cutting out the legs of the administrative process on which it stands; it accomplishes this result by misapplying and retooling precedent. I would affirm the district court, which held the plaintiffs failed to raise their "concerns" through the prescribed administrative process and should therefore not be granted relief when they arrive at the federal courts.

Finally, the majority substitutes its own judgment for the Army's as to whether there exists a reasonable alternative to "in place" transformation. The Army did not have to consider relocation of the 2nd Brigade in Hawaii because it had already determined transformation of all its brigades including the 2nd Brigade would be "in place." The Army did have to consider reasonable alternatives to full transformation in Hawaii, including a no-action alternative, and the Army did so. The Army adequately considered environmental impacts to Hawaii by alternatives consistent with the purpose and need of the project.

I

A

In 1999, the Secretary of the Army and Chief of Staff of the Army articulated a vision of transformation of *all* Army brigade units into what the Army thought would be a more effective and dominant force, responsive to what it saw as new and

different strategic threats to the nation. In 2000, the Army published notices of its intended transformation in the Federal Register and in USA TODAY. The Federal Register notice informed the public the Army intended to prepare a Programmatic Environmental Impact Statement (PEIS);[2] the USA TODAY notice announced the Army was seeking public input for the PEIS. The initial draft of the PEIS was completed in 2001.[3] The Army then published notices the draft PEIS was available to the public for the asking. These notices were again published in the Federal Register and in USA TODAY. Those notices announced a public comment period during which members of the public could submit comments that would be considered before the final PEIS issued.

Given this series of published notices, it is clear the Army met its notice obligations under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (NEPA). 40 C.F.R. § 1506.6(b)(2) provides that for each "action with effects of national concern notice shall include publication in the Federal Register and notice by mail to national organizations reasonably expected to be interested in the matter . . . ." The Army transformation program was national in scope; no program is more "national" in scope than the transformation of the whole Army, located over all the states and in foreign

[2]Consistent with the PEIS's statement of purpose and need, the Federal Register notice informed readers: "The Army will implement transformation as rapidly as possible, while continually maintaining the warfighting readiness of its operational forces . . . ." 65 Fed. Reg. 78476 (Dec. 15, 2000). It also noted "all aspects" of the Army would undergo transformation. *Id.*

[3]The draft PEIS informed readers: "For the foreseeable future, the Army would expect to conduct its transformation of existing operating forces 'in-place.' Relocation of units would not be anticipated." Draft Programmatic Environmental Impact Statement (Oct. 2001), at 4-3, AR 0003714. It also informed readers that "[t]he Army has tentatively identified three additional brigades . . . for sequenced transformation [including] the 2nd Brigade, 25th Infantry Division (Light), Schofield Barracks, Hawaii." *Id.* at 2-9, AR 0003597.

countries. Plaintiffs are clearly not a "national organization" reasonably expected to be interested in the national transformation, nor do they claim to be. As such, the Army correctly chose to and did comply with Council on Environmental Quality (CEQ)[4] and Army regulations. It published in the Federal Register (as required) and in USA TODAY (as unrequired outreach) and it did not mail to plaintiffs since they are not a national organization, a point they concede. The notice was adequate. Indeed, the majority cannot bring itself to find otherwise. Although vigorously urged by plaintiffs to reverse on this ground, it does not overrule the district court's denial of summary judgment to the plaintiffs for inadequacy of the notice. *Maj. Op.* at 17464.[5]

B

Plaintiffs do not challenge—even on appeal—the most important determination by the Army in this case: "in place" transformation of all brigade units. The Army discussed and analyzed the impacts of its overall transformation in the PEIS. The PEIS stated the purpose and need of overall Army transformation was to modernize the Army's units "in the most timely and efficient manner possible and without compromising readiness and responsiveness." Final Programmatic Environmental Impact Statement (Feb. 2002), at 1-2, AR 0003865. To that end, the PEIS determined that "the Army would expect to conduct its transformation of existing operating forces 'in place.' Relocation of units would not be anticipated." *Id.* at 4-3, AR 0004000. Plaintiffs do not quarrel with any of this; rather, they aim to have the court create a requirement

---

[4]The CEQ sits within the Executive Office of the President and is composed of three members appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. 42 U.S.C. § 4342.

[5]Albeit not without a "tsk-tsk" footnote counseling the Army it was not "wise" in its notification. *Maj Op.* at 17464 n.4. This merely serves to emphasize the Army *did* comply with legal requirements; it just didn't do so in a way that pleases those in the judiciary who would be its editors.

that the Army analyze alternate locations for training each bri-gade notwithstanding the Army's reasoned and unchallenged decision to transform units "in place." Once the decision to transform all brigade units "in place" was made, the Army was not obligated to consider stationing alternatives; those alternatives were by definition unreasonable and irrelevant. The fact the PEIS identifies the 2nd Brigade as an Interim Force brigade does not change this conclusion. Every unit in the Army is either in the Initial (first), Interim (second), or Objective (third) Phase. All eventually will transform from traditional brigades to Stryker brigades. Whether the 2nd Bri-gade was selected in the PEIS or later in a different document, the fact remains that because all Army units will be trans-formed "in place" to ensure timely transformation and readi-ness, stationing alternatives need not be considered.

The plaintiffs *could* have challenged the Army's "in place" decision which ruled out alternative relocations of the units. However, the challenge would have had to prove the Army's decision was "arbitrary and capricious," for that is the correct standard of review. *See* 5 U.S.C. § 706; *Lands Council v. Powell*, 395 F.3d 1019, 1026 n.5 (9th Cir. 2005) (arbitrary and capricious standard applies to claims of inadequate analy-sis under NEPA). They did not so challenge; they do not even now. This is the principal reason why this appeal is without merit. Plaintiffs' argument that the Army had to consider relo-cation of the 2nd Brigade ignores (and fails to challenge) the elephant in the living room: *the Army had already determined that to achieve its purpose and need, transformation of all units, including the 2nd Brigade in Hawaii, would be accom-plished "in place."*

C

1

Even if plaintiffs had properly challenged the Army's "in place" transformation of all Army units, I would find the

Army's exercise of judgment in choosing it was not arbitrary and capricious. Like any other federal agency, the Army must comply with NEPA; it is not exempt just because it guards our national security. And, as with other federal agencies, NEPA does not mandate environmentalist groups to tell the Army how to do its job. What NEPA tells the Army is what procedures it must follow to analyze environmental issues. *See Powell*, 395 F.3d at 1026-27. That is, NEPA mandates how the Army should go about deciding these issues; not what it should decide as to any of them. Finally, the procedures must be reasonable in the circumstances, or within the purpose and need of the agency's project. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1067 (9th Cir. 1998) ("When the purpose [of a project] is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." (quoting *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986)) (emphasis omitted)). Given the sequence of strategic decisions by the Army, its decision to transform units "in place" was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

Suppose the Army wanted to set up an artillery firing range (purpose) at one of several locations. All else being equal, the Army should consider at which location the shells will do the least damage to the flora and fauna. It does not make much difference to the Army where the shells fall (need). But if what is proposed is to deny the enemy San Francisco Bay (purpose) by fortifying the high ground bordering it, with cannon that can shoot down to rake the enemy ships that may be in the Bay, the Army is not made to consider the alternative of placing the cannon on the flat, all to save some trees that grow on the hills' rim. Nor can the Army be made to spare the trees if they get in the way of moving the cannon quickly. The Army would require shoot down capability and movement in its cannon (need).

When the Army spells out its purpose and need for a project, this court can review its decision not to consider alterna-

tive locations less harmful to the environment only when the suggested alternatives are reasonable, given the purpose and need of the Army's project. That review is limited to the question whether the Army acted arbitrarily and capriciously— that is, unreasonably—in failing to consider the alternatives. 5 U.S.C. § 706; *Powell*, 395 F.3d 1019, 1026 n.5. Here, "in place" transformation was not unreasonable in view of the purpose and need of the Army's transformation: relocation was ruled out as a reasonable possibility because the Army's purpose and need to transform its units to Stryker Brigades must be done as quickly as possible while maintaining combat-readiness. This case is like the location of the cannon on the hill, not the selection of the artillery range.

2

As noted, the decision to transform "in place" was within the Army's stated purpose and need of upgrading its units quickly while maintaining readiness. The Army has stated *all* Army units will undergo transformation within the next thirty years. The consideration of alternate locations for transformation would require taking into account all the places to which each of the brigades could be transferred for training. Conceivably, the Army could consider relocating each brigade to another base. But, it would be fatuous to consider relocating units merely for the exercise of relocating them. That would simply be a bureaucratic game of "musical chairs."

If consideration is to be given to alternate locations for training, there must be some Army bases where the training can take place with less danger of environmental harm than there is to other bases. Indeed, there may be a base so bereft of flora, fauna and archeological troves that little harm could be done there by 20-ton Stryker vehicles, no matter how sophisticated the investigative techniques used by environmental groups such as plaintiffs. Call such a location Camp X. The majority would have each of the Site-Specific Environmental Impact Statements (SEISs) for each of the brigades

"consider" relocation to Camp X. If to "consider" is to be anything more than a doff of the hat to environmental groups, any reasonable administrator will actually be obligated to decide that each brigade should be transformed at Base X. The result is that each of the seventy brigade-sized units would be transformed, one at a time, at Camp X. Equipping and transforming a Stryker Brigade Combat Team takes two years, plus an additional period to reach Final Operational Capability. Suppose the total time to achieve transformation of a brigade is two and a half years: that computes to 175 years to achieve the overall transformation the Army needs done in thirty. In 175 years, perhaps even the Stryker will be surpassed by technology and be considered as effective a military artifact as is now the rowboat used to ferry General Washington to Trenton.

Ah, but the 175 years would be cut to thirty, if six such Camp Xs were designated. But, how would one maintain combat-readiness for the six itinerant brigades which, like the soul of the Flying Dutchman, would have to move each 2.5 years to the bases of the brigades being sent to the six Camp Xs, and never reach their original homes until the end of the program? Charged with the "purpose and need" of transforming quickly and maintaining combat-readiness, can we say it was "arbitrary and capricious" for the Army to determine that each brigade should transform "in place," that is, at its own home base? The Army chose to foreclose a more circuitous route to transformation in the PEIS, and its decision is entitled to deference. Preparing an EIS "necessarily calls for judgment, and that judgment is the agency's." *Westlands Water Dist. v. United States Dept. of the Interior*, 376 F.3d 853, 866 (9th Cir. 2004) (internal quotation marks omitted).

This is not to deny that the Army *may* relocate forces during its transformation. The Army decided to relocate the 2nd Armored Cavalry Regiment from Fort Polk, Louisiana, to Fort Lewis, Washington, so that a Brigade Combat Team could be created at Fort Polk. How can this lawful exercise of agency

power translate into a requirement that the Army must consider relocation of all units or relocation of the 2nd Brigade? A particular relocation would have to conform to applicable requirements, including perhaps NEPA requirements, but those are not at issue here. The decision to relocate a particular regiment has no bearing on NEPA requirements involving the Army's overall transformation. The relocation of one regiment does not render relocation of other regiments reasonable or feasible, particularly where the Army has cited the strategic importance of the Pacific Rim. Nor do individual relocations estop the Army from stating that large-scale relocation is outside the scope of the transformation process.

## II

From the adequacy of the notice, *see supra* Part IA, one must conclude that because the plaintiffs had notice that Army units—including the 2nd Brigade—would be transformed "in place" and yet failed to take the opportunity to comment, complain or voice any "concerns," plaintiffs should be barred from bringing the present action. This section concludes that plaintiffs waived any challenges to Army transformation in Hawaii when they failed to comment on the Army's EISs, which did not contain any errors that were "so obvious" that plaintiffs' failure to comment can be excused.

## A

Anyone who had written to the Army or navigated to the Army webpage as provided in the 2001 notices would have received a copy of the draft PEIS. Anyone who had then read the draft PEIS would have learned the Army intended to transform all its forces "in place." Someone reading the draft PEIS would have seen something else: the 2nd Brigade in Hawaii had been tentatively selected to participate in the Interim Phase of the transformation, which meant it would transform itself earlier than the other 60-odd Army brigades. After an agency makes an EIS available, the Environmental

Protection Agency publishes a Notice of Availability that begins a period during which the agency must accept comments from the public regarding the EIS. 40 C.F.R. § 1506.10. Here, plaintiffs had at least 45 days during which they could make their comments or complaints, or voice their "concerns," about the 2nd Brigade's transformation in Hawaii as opposed to other locations, which plaintiffs imagined to be reasonable alternative locations. If plaintiffs wanted to argue that the Army had not given sufficient consideration to the relocation of units during transformation, they were told by the notices where and when they could challenge the Army's judgment that the most rapid transformation possible, while maintaining combat-readiness, requires the transformation and its training "in place," i.e., at each brigade's home base.

The Administrative Procedure Act requires plaintiffs to exhaust remedies before bringing suit in federal court. 5 U.S.C. § 704. "The purpose of the exhaustion doctrine is to allow the administrative agency in question to exercise its expertise over the subject matter and to permit the agency an opportunity to correct any mistakes that may have occurred during the proceeding, thus avoiding unnecessary or premature judicial intervention into the administrative process." *Daly-Murphy v. Winston*, 820 F.2d 1470, 1476 (9th Cir. 1987) (internal quotation marks omitted) (district court did not abuse its discretion in requiring Veterans Administration (VA) hospital doctor to raise wrongful suspension claims through the VA's prescribed peer review and other administrative procedures because procedures were not inadequate, inefficacious, futile, harmful, or void, and injury was not irreparable because suspension was with pay); *see also McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) ("[T]he exhaustion doctrine recognizes the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer. . . . The exhaustion doctrine also acknowledges the commonsense notion of dispute resolution

that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."); *Ruviwat v. Smith*, 701 F.2d 844, 845 (9th Cir. 1983) ("[T]he requirement of exhaustion of remedies will aid judicial review by allowing the appropriate development of a factual record in an expert forum; conserve the court's time because of the possibility that the relief applied for may be granted at the administrative level; and allow the administrative agency an opportunity to correct errors occurring in the course of administrative proceedings."); *cf. I.N.S. v. Orlando Ventura*, 537 U.S. 12, 17 (2002) ("The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides.").

The Supreme Court held in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519 (1978), that the exhaustion requirement applies to claims under NEPA. There, a group called Saginaw commented on a draft EIS written by the Atomic Energy Commission (AEC) for construction of two nuclear power plants, raising 119 environmental contentions, seventeen of which the D.C. Circuit interpreted as assertions the EIS was fatally defective for failure to examine "energy conservation" as an alternative to a nuclear power plant. *Id.* at 531-32; *Aeschliman v. U.S. Nuclear Regulatory Comm'n*, 547 F.2d 622, 625 (D.C. Cir. 1976). The AEC revised the EIS and conducted further hearings at which Saginaw declined to participate. *Vermont Yankee*, 435 U.S. at 532. The AEC's Licensing Board granted a permit for construction of the plants and its Appeal Board affirmed. *Id.* at 533. After the CEQ promulgated new regulations requiring EISs to consider "energy conservation" alternatives, Saginaw moved to have the AEC clarify its ruling and reopen proceedings on the power plants. *Id.* The Commission declined, noting it had been willing to take evidence on Saginaw's contentions but that Saginaw had failed to present

any and had shown "total disregard of even those minimal procedural formalities necessary to give the Board some idea of exactly what was at issue." *Id.* at 533-34. The Commission noted that it had a responsibility to conform to the CEQ's new regulations, but that "the Board must have some workable procedural rules" and that "intervenors also have their respon- sibilities. They must state clear and reasonably specific energy conservation contentions in a timely fashion. Beyond that, they have a burden of coming forward with some affir- mative showing if they wish to have these novel contentions explored further." *Id.* at 534. Saginaw then challenged the grant of the construction permit by filing a lawsuit in the D.C. Circuit, and the court remanded for further proceedings, hold- ing that because Saginaw had identified "in a general way" the measures it wanted considered, the agency should not have rejected energy conservation alternatives without inquiry or explanation, and doing so was arbitrary and capricious. *Aeschliman*, 547 F.2d at 629-30. The court also criticized the AEC's practice of refusing to entertain comments that did not meet a "threshold test" of substantiality as imposing a "heavy substantive burden[ ]" on intervenors. *Id.* at 626-27 & n.11.

The Supreme Court reversed. *Vermont Yankee*, 435 U.S. at 558. The Court first noted that "energy conservation" was then a concept of recent vintage, and given its open-ended and evolving nature, the Licensing Board's decision to grant the construction permit was within the proper bounds of its statu- tory authority. *Id.* at 552-53. The Court then approved the AEC's "threshold test," and held that while the agency must comply with NEPA, "it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Id.* at 553. The Court reasoned that "administrative proceedings should not be a game or a forum to engage in unjustified obstructionism" and that "[c]omments must be significant enough to step over a threshold require- ment of materiality before any lack of agency response or consideration becomes of concern." *Id.* at 553-54 (internal

quotation mark omitted). The Court held that to characterize the AEC's actions as arbitrary and capricious would "deprive those words of any meaning." *Id.* at 554. It emphasized the limited role of reviewing courts that it opined the D.C. Circuit had "forgotten":

> [T]he role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review. Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.

*Id.* at 555 (internal quotation mark omitted).

Just as *Vermont Yankee*'s intervenors should have raised objections material enough to suggest real issues of "energy conservation" as an alternative to the proposed nuclear plants, plaintiffs here should have shown real world alternatives to the Army's twin requirements of maximum speed in transformation while maintaining combat-readiness, or that the application of these twin requirements, which resulted in the decision to transform "in place" for all brigades, was "arbitrary and capricious." *Powell*, 395 F.3d 1019, 1026 n.5. This plaintiffs have never done. Nor did they raise issues regarding suitable alternate locations in the event that attacks on the purpose and need, as expressed in the twin requirements, were successful.

In *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), the Supreme Court unanimously reaffirmed its view that, under NEPA, would-be intervenors must participate meaningfully in agency proceedings or waive their challenges to agency decisionmaking. There, the Federal Motor Carrier Safety Administration (FMCSA) had promulgated rules allowing Mexican trucks to operate in the United States

and issued an Environmental Assessment (EA) that stated the proposed rules would have no significant impact on the environment; the agency therefore did not prepare a full EIS. *Id.* at 762. Unions and environmental groups made comments in response to the EA but had not suggested in those comments that the agency consider claimed environmentally superior alternatives to the proposed rules. *Id.* at 764-65. The agency issued the rules, and the unions and groups filed petitions with this court arguing the rules were in violation of NEPA. *Id.* at 762. This court remanded for preparation of a full EIS on the ground that the agency had failed to give adequate consideration to the overall environmental impact of its rules allowing the trucks to operate. *Id.* at 762-63. Reversing, the Supreme Court held that the unions' and groups' argument that the agency had to consider alternatives to its proposed rules were challenges not properly before the court. *Id.* at 764. The Court noted the unions and groups had neither "identified in their comments any rulemaking alternatives" other than those evaluated by the FMCSA in its environmental assessment (EA), nor "urged FMCSA to consider alternatives." *Id.* The Court held the unions' and groups' claims to be waived:

> Because respondents did not raise these particular objections to the EA, FMCSA was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available. Respondents have therefore forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action.

*Id.*

Just as the unions and environmental groups failed to suggest cleaner air alternatives to the FMCSA, plaintiffs have failed to suggest lesser environmental impacts could result from a consideration of alternate, rather than "in place," sites for troop transformation.

With respect, the majority's attempts to distinguish *Public Citizen* and *Vermont Yankee* fall short and are contrary to the well-established purpose of the requirement of exhaustion of remedies. The majority argues that those cases do not control because there the plaintiff organization submitted inadequate comments or failed to follow up on submitted comments. The majority would limit *Vermont Yankee* to those cases in which a plaintiff group submits some comments, yet not apply its rule when a plaintiff group furnishes no comments at all. This makes no sense at all. It would provide an incentive for challenging groups to "hide the ball" in agency proceedings, lest some tepid and ambiguous comments be held to fall within *Vermont Yankee*'s bar. If aspiring intervenors fear *some* participation in agency proceedings will bar them from asserting additional comments in future judicial proceedings, such groups might prefer simply to lie in the weeds, eschew agency proceedings, and later take their suggestions directly to the federal courts, as authorized by today's majority decision. "[E]xhaustion principles apply with special force when frequent and deliberate flouting of administrative processes could weaken an agency's effectiveness by encouraging disregard of its procedures." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) (internal quotation marks omitted). If cryptic and obscure comments cause administrative proceedings to devolve into "a game or a forum to engage in unjustified obstructionism," *Vermont Yankee*, 435 U.S. at 553, plaintiffs' skipping the administrative process altogether threatens to turn agency proceedings into something resembling a meaningless charade. *See Public Citizen*, 541 U.S. at 764 (holding the purpose of the *Vermont Yankee* rule is to "allow the agency to give the issue meaningful consideration"). Here, had the plaintiff groups properly presented the claims they *now* make, the Army could have exercised its responsibility and authority to research and analyze the plaintiffs' claims.[6]

---

[6]Conceivably, it could have shown the plaintiffs their only viable claim was to attack the Army's finding that because of its purpose and need, transformation "in place" was required.

This procedure would have either mooted the present dispute or provided a stronger record on which the federal courts could decide the issue, rather than having to remand for a supplemental EIS, as the majority does. Interposing federal judges as referees in the administrative process carries significant risks of extending judicial influence where it is not warranted. "While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make . . . policy choices." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984).

Despite the majority's insistence to the contrary, *Kunaknana v. Clark*, 742 F.2d 1145 (9th Cir. 1984), does not require a different result here. There, two Eskimos who led a subsistence lifestyle in the North Slope region of Alaska sued under the Alaska National Interest Lands Conservation Act (ANILCA) to challenge oil and gas leases granted by the Bureau of Land Management. *Id.* at 1147. The court affirmed the district court's denial of the plaintiffs' claims on the ground the agency had complied with the procedural requirements of ANILCA. Before doing so, however, the court held the Eskimos' claims were properly before the court. The court observed that "[t]he purpose of the ANILCA was to protect those North Slope natives who, like appellants, lead a subsistence lifestyle." *Id.* at 1148; *see also* 16 U.S.C. § 3101(c) (Congressional statement of purpose of ANILCA). The court excused the Eskimos' failure to participate meaningfully in the administrative process and entertained the merits of the Eskimos' claims. *Kunaknana*, 742 F.2d at 1148. The majority is correct that the court refused to adopt a "broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision." *Id. Kunaknana*, however, is distinguishable as a non-NEPA case involving another statute the purpose of which was to protect a specifically named class of Eskimos who sued under that statute. It is not authority for the interpretation

of a statute (NEPA) not involved in the case and which targets no specific class of protected plaintiffs.

*Kunaknana* is a case involving "exceptional circumstances" within the meaning of *Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991) (per curiam). In *Havasupai Tribe*, the Forest Service approved a plan of operations for a uranium mine and plaintiffs sued, claiming the agency's EIS contained inadequate consideration of the impact on groundwater of a planned mine. *Id.* at 33. The district court affirmed the Forest Service, holding the agency had adequately considered the issues the plaintiffs were raising. *Id.* at 34. This court affirmed, and held that the district court could have refused to reach the merits of the plaintiffs' claim the EIS was inadequate due to the plaintiffs' failure to raise this challenge before the agency. *Id.* We held that "[a]bsent *exceptional circumstances*, such belatedly raised issues may not form a basis for reversal of an agency decision." *Id.* at 34 (emphasis added). Although the majority is correct that in *Havasupai Tribe*, the plaintiffs' comments were solicited, *see Maj. Op.* at 17462-63, nothing in *Havasupai Tribe* equates exceptional circumstances with the *lack* of being personally solicited. *See id.* Here, the concededly adequate notices did solicit plaintiffs'—and everybody else's—input. Seen in this light, *Kunaknana* is a case that fits into *Havasupai Tribe*'s exception for cases that present "exceptional circumstances." In *Kunaknana*, the exceptional circumstances that justified the court's carving out an exception to the *Vermont Yankee* rule was to effectuate Congress's special protection for Eskimos in ANILCA, a reason that is totally inapplicable here, even by analogy. *See Kunaknana*, 742 F.2d at 1151. Plaintiffs have not identified any exceptional circumstances warranting their excusal from *Vermont Yankee*'s requirement, a requirement recently affirmed by the Court in *Public Citizen*.

*Northwest Environmental Defense Center v. Bonneville Power Administration*, 117 F.3d 1520 (9th Cir. 1997), does not weaken this conclusion. First, as the majority acknowl-

edges, that case's discussion of waiver involved the Northwest Power Act, not NEPA.[7] *See Maj. Op.* at 17464. Second, even if *Bonneville Power* controlled, the plaintiffs' failure to participate should not be excused. The plaintiffs' claim that the Army should have considered relocation of the 2nd Brigade as a *reasonable* alternative in its EISs is a "specific factual contention regarding the substantive content of an EIS," therefore requiring timely participation, and not a "procedural violation" under which a plaintiff's failure to participate in the administrative process might be excused. *Bonneville Power*, 117 F.3d at 1535. After all, what is more a "specific factual contention" than whether something is "reasonable"? Juries are called upon daily to determine whether defendants acted with "reasonable care." Plaintiffs had notice that the Army had decided to transform "in place" and that such determination included the 2nd Brigade. Whether the purpose and need of the project made consideration of alternate locations "reasonable" was a preliminary factual issue that had to be determined before the procedural duty to consider the alternate sites was triggered. The plaintiffs had to alert the Army that the Army's determination that no alternate locations for transformation were "reasonable" in view of the Army's purpose and need was a determination that had to be examined. As I noted at the beginning of this dissent, even *now* the plaintiffs do not make that claim, the only claim that is conceivably viable: that the purpose and need of the Army transformation (the "twin requirements" mentioned *supra*) are "arbitrary and capricious" or that the Army's decision that such purpose and need require "all units" to transform "in place" is "arbitrary and capricious."

---

[7]Far from stating NEPA and the Northwest Power Act were "analogous" statutes, the *Bonneville Power* court noted that "[i]n contrast" to the NEPA cases *Vermont Yankee* and *Havasupai Tribe*, the facts in *Bonneville Power* entailed "an alleged procedural violation of a statute that governs the public comment process," namely the Northwest Power Act. *Id.* at 1535.

B

The opinion further holds, I think in error, that the Army's EIS contained flaws that were "so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *See Maj. Op.* at 17464 (quoting *Public Citizen*, 541 U.S. at 765). The Supreme Court penned this language, clearly dicta, in *Public Citizen*. In doing so, it found that this "so obvious" exception did not apply on the facts of that case. *Id.* at 765. It should not apply here, either.

The majority cites dissidence among the Army's staff as evidence of the proposition that errors in the EIS were "so obvious" that plaintiffs were not required to raise objections during agency proceedings. If anything, internal dissidence shows there was healthy debate and discussion within the Army over whether alternatives such as relocation of units undergoing transformation could be considered reasonable in view of the purposes and needs of the program which—we must remember always, and from the first notice of the draft PEIS—required transformation "in place" of each and all of the Army's brigades. In any event, dissidence among agency members does not fit the mold of *Public Citizen*'s exception for obvious errors.[8] Rather, here, as in *Public Citizen*, plaintiffs "fail to identify any evidence" that shows relocation of the 2nd Brigade for either temporary training or permanent transformation to any particular location would advance environmental goals. *Id.*; *see also Angoon*, 803 F.2d at 1022 (9th

---

[8]I find puzzling the majority's reliance on *Friends of Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000), to interpret *Public Citizen*. That case dealt with whether an EIS contained flaws that rendered the EIS inadequate, not whether those flaws were also so obvious that, in addition to rendering the EIS inadequate, the flaws dispensed with the requirement that the commentator identify the flaws during agency proceedings to preserve the flaws as error in later court proceedings. *See id.* at 558-59. The issue of waiver was never in that case because the public commentator had raised the objection or "concern" at the proper time. *See id.* at 555.

Cir. 1986) (where plaintiff organization had not offered a "specific, detailed counterproposal" demonstrating environmental benefits, the consequences of its proposal were merely "remote and speculative"). In *Public Citizen*, the Court held that "removing older, more polluting trucks through more effective enforcement of motor carrier safety standards" would not obviously have a positive environmental impact because "respondents fail to identify any evidence that shows that any effect from these possible actions would be significant, or even noticeable, for air-quality purposes." *Id.* at 765.

Likewise, plaintiffs here fail to identify any evidence that shows relocation of the 2nd Brigade would have significant, or even noticeable, environmental benefits. In that sense, I agree with the majority that "nothing in the record distinguishes Hawaii from Alaska or Washington." *Maj. Op.* at 17479.[9] The record, including the SEIS, details the environmental impacts that transformation would have on Hawaii. Yet the record is silent regarding alternative transformation sites that should have been obvious to the Army. It is not the Army's obligation to guess what stationing locations plaintiff organizations would prefer to Hawaii; it was the *organiza*tions' responsibility to suggest relocation and alternative siting locations during the administrative process and clearly to state why those alternate locations decreased any claimed environmental impacts. *See Public Citizen*, 541 U.S. at 764-65; *see also Angoon*, 803 F.2d at 1022. It is the *Army's* job to evaluate *reasonable* alternatives within the stated purpose and need, but as appears in the next Part, relocation of the 2nd Brigade was not a *reasonable* alternative the Army had to evaluate. But even if relocation were a "reasonable alternative," it is not "so obvious" as to exempt it from being raised at the administrative level so properly to exhaust what is now plaintiffs' claim.

---

[9]But see *infra* pp. 17504-06 for rejection of this comparison when it used geographical locations.

III

The Army also met its obligation in the SEIS to consider reasonable alternatives to the proposed action of transforming the 2nd Brigade in Hawaii. The Army's SEIS states its purpose as: "to assist in bringing the Army's Interim Force to operational capability and to provide realistic field training in Hawai'i." Final Site-Specific Environmental Impact Statement, Transformation of the 2nd Brigade, 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii (May 2004) ("Final SEIS"), at 1-4, AR 0051275. The need is stated as: "to provide the nation with capabilities that meet current and evolving national defense requirements." *Id.* The Army's statement of purpose and need is reasonable. Under this purpose and need, the SEIS analyzed a number of alternatives to full transformation in Hawaii, which alternatives would have had substantially similar environmental impacts to relocation of the 2nd Brigade, as plaintiffs urge should have been considered. These alternatives include training the 2nd Brigade on the mainland, and a no-action alternative, under which the 2nd Brigade would not be transformed into a Stryker brigade.

A

"Courts have afforded agencies considerable discretion to define the purpose and need of a project." *Westlands Water Dist.*, 376 F.3d at 866 (internal quotation marks omitted). The SEIS states its purpose is to assist in making the Interim Force operational and to provide realistic field training in Hawaii. These purposes follow directly and respectively from the PEIS's lawful decisions that the 2nd Brigade would transform as part of the Interim Force[10] and that transformation of bri-

---

[10]To the extent plaintiffs argue the decision to transform the 2nd Brigade as part of the Interim Force, rather than later, lacked sufficient analysis of reasonable alternatives, I disagree. All brigades will be transformed, and some brigade has to be in the Interim Force, just as two brigades were in the Initial Phase. Nothing in the record shows the exercises of Stryker vehicles or other transformation activities will be different in different phases.

gades would be "in place." The SEIS's statement of need adds that the 2nd Brigade was chosen because the Pacific Rim is a critical area of interest for the United States, because Hawaii provides terrain and conditions most likely to be encountered by troops in the Pacific Rim, and because a team stationed in Hawaii may readily be deployed from airbases and seaports of suitable size. I find nothing unreasonable in the SEIS's statement of purpose and need.[11]

The majority quarrels with the SEIS's statement of reasons why Hawaii was selected for transformation, *see Maj. Op.* at 17478-81, but we should defer to the Army's judgment in matters such as deployment and training terrain and conditions, which are fact-bound and technical matters and, therefore, within the Army's discretion. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989) (agency is entitled to deference when a dispute centers on fact-bound matters within the agency's expertise). Moreover, the majority's contentions are unpersuasive. The majority rejects the SEIS's statement that maintaining a presence in the Pacific Rim justified stationing a Stryker Brigade Combat Team (SBCT) in Hawaii, by astonishingly concluding "[n]othing in the record distinguishes Hawaii from Alaska or Washington." *Maj. Op.* at 17479. In fact, the record shows that deployment times from Hawaii to areas in South Asia are shorter than deployment times from Washington. U.S. Army Headquarters, Stryker Brigade Combat Team Primer (Aug. 12, 2003) at 5, AR 0006213. Additionally, deployment times from Hawaii to the South Pacific are shorter than deployment times from Washington and, by a small margin, Alaska as well. *Id.* The majority also contends the SEIS does not support its own statement of need because the Kawailoa Training Area

---

[11]Nor, as I explain below, do I agree with the majority that the decision to transform in Hawaii was settled prior to creation of the SEIS. *Maj. Op.* at 17472. The SEIS considered a range of alternatives, including a no-action alternative that would have abandoned the plan to transform the 2nd Brigade in Hawaii.

(KLOA) on Oahu cannot support Stryker vehicles except on Drum Road. This argument is easily dispatched under our deferential standard of review, for there is nothing unreasonable about the Army wanting to have Stryker vehicle exercises on Drum Road coordinated with troop exercises in the nearby mountainous jungle setting in the KLOA. An agency's decisions cannot be nullified under NEPA "simply because the court is unhappy with the result reached." *Vermont Yankee*, 435 U.S. at 558.

B

The SEIS explored the possibility of maneuver live-fire and nonlive-fire training on the continental U.S. instead of Hawaii, which casts significant doubt on the plaintiffs' claim that the Army separately needed to consider relocation of the 2nd Brigade. An agency is not required to undertake a "separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Westlands Water Dist.*, 376 F.3d at 868 (citing *N. Plains Res. Council v. Lujan*, 874 F.2d 661, 666 (9th Cir. 1989) (holding that, because an exchange of fee coal interests had substantially similar consequences to coal leasing, NEPA did not require separate analysis of the exchange)). Here, the crucial factor is that the *environmental impacts* of relocating the 2nd Brigade would have been substantially similar to the mainland training alternative and the no-action alternative. The mainland training alternative would have provided for the 2nd Brigade and its weapons and materiel to be transported to one of the three other SBCT sites, located in Alaska, Washington, and Louisiana, for training. Under this option, the Army would not need to acquire a 23,000 acre plot of land and build battle area complexes and other facilities in Hawaii. The record is clear that moving live-fire training to the mainland and not engaging in construction would lessen the "most significant" environmental impacts on Hawaii of transformation.[12] Final SEIS

---

[12]This is not to say that mainland training or even relocation would have environmental benefits. As developed *supra* in Part IIB of this dissent, the

at 4-69-4-72, AR 0051516-0051519. This option was rejected as unfeasible and impractical due to the cost and inefficiency of moving the soldiers and equipment to and from Hawaii, and the strain it would place on the mainland sites. *Id.* at 2-52, AR 0051337. NEPA does not mandate any substantive outcome in particular. *See Powell*, 395 F.3d at 1026-27. Although ultimately unnecessary, because of its determination to transform all units "in place," the Army's consideration of training outside of Hawaii shows it evaluated an option with substantially similar consequences as full relocation.

The Army could have decided not to transform the 2nd Brigade in Hawaii by selecting the no-action alternative, which also would have had substantially similar environmental consequences as full relocation. The majority is correct that the SEIS considered the no-action alternative, but it is incorrect that this alternative would have "involved transformation of the 2nd Brigade in Hawaii on Oahu." *Maj. Op.* at 17469. Selection of the no-action alternative would have caused the 2nd Brigade *not* to be transformed into a Stryker brigade. The SEIS stated the no-action alternative would not meet the purpose and need for transforming the 2nd Brigade, and in the SEIS Record of Decision, the Army determined that moving forward with transformation in Hawaii "reflect[ed] a proper balance among competing factors, most notably statutory mission imperatives, environmental impacts, technical considerations, and all practicable means that will avoid or minimize environmental harm." Record of Decision, Transformation of the 2nd Brigade, 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii (July 2004), at 1, AR 0048483. This was entirely lawful, and the fact the SEIS stated its purpose was to provide realistic field training *in Hawaii* does not change this conclusion. We have held before

___

plaintiffs fail to identify evidence showing that relocation or selection of a different brigade for transformation would have obvious environmental benefits.

that an agency "[does] not act unreasonably in rejecting [a] no-action alternative on the ground that it would not meet the purpose and need of the proposed project." *Morrison*, 153 F.3d at 1067. "[W]hen the purpose [of a project] is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." *Id.* (quoting *Angoon*, 803 F.2d at 1021). Under the no-action alternative, the Army would continue to train in Hawaii as it currently does, and the resulting impacts would be "less than significant" because the brigade would not transform into a Stryker brigade. Because this option had substantially similar environmental consequences as full relocation, the Army did not also separately have to consider relocation of the 2nd Brigade.[13]

Complete restationing of the 2nd Brigade out of Hawaii would, of course, have had consequences that none of the options discussed heretofore would, namely, the 2nd Brigade would not continue to operate in Hawaii, either as an SBCT *or otherwise*. To the extent relocation of the 2nd Brigade is urged as a reasonable alternative on this basis, it is completely outside the scope of Army transformation, and the Army did not have to consider it. *See Westlands Water Dist.*, 376 F.3d at 866; *see also id.* at 871 ("[I]t would turn NEPA on its head to interpret the statute to require that [an agency] conduct in-depth analyses of . . . alternatives that are inconsistent with the [agency's] policy objectives." (alterations in original) (quoting *Kootenai Tribe v. Veneman*, 313 F.3d 1094, 1122 (9th Cir. 2002))).[14]

---

[13]The SEIS also explored transformation of a different brigade at another location—yet another option with substantially similar consequences as full relocation. The Army determined this was not a viable alternative: "[B]ecause the Pacific Rim is a critical area of interest for the United States," stationing an SBCT in Hawaii "allows the President to rapidly respond to events in an area of increasing importance to national security." Final SEIS at 2-47, AR 0051332.

[14]I am also puzzled as to why the majority orders the preparation of a supplemental EIS. As this case is an appeal from a grant of summary judg-

The Army's consideration of these alternatives establishes that the Army looked at reasonable alternatives to transformation in Hawaii, given the conclusion that the Army could determine that transformation of all units would be "in place." Once the constraint[15] of "in place" transformation was decided upon—quite properly—in the PEIS, the SEIS could consider as its only alternatives not transforming in Hawaii at all, or taking various measures to mitigate the impact of transformation, such as a reduced land usage or through conducting training elsewhere. The SEIS did both. Not transforming the 2nd Brigade was rejected in favor of transformation, which the Army decided better balanced environmental impacts with mission imperatives and the need to maintain the ability to respond quickly to events in the Pacific Rim. Mitigation through mainland training would have meant less environmental impact to Hawaii, but the plan was rejected as unfeasible and impractical due to the significant transportation requirements entailed. NEPA requires no more. *See Vermont Yankee*, 435 U.S. at 558 ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.").

\* \* \*

_____

ment, the proper remedy would be to reverse the grant of summary judgment and remand to the district court. Additionally, if the majority mean to reverse the denial of the plaintiffs' motion for summary judgment, it should say so and remand for entry of judgment in plaintiffs' favor, permanently enjoining the project. The Army can always commence a new Notice-PEIS-SEIS proceeding rather than take its chances on the truncated proceeding devised by the remand.

[15]A constraint quite accurately recognized by an Army attorney and indeed felicitously reproduced throughout the Majority Opinion. *See Maj. Op.* at pp. 17460, 17473-74 n.5, and 17476 (noting the Army's purpose and need statements were "crafted so tightly that we may be restricting ourselves"). "Restricting ourselves" from *what*? From considering alternate locations for transformation because of the "in place" determination, of course.

The majority opinion places the Army in an awkward position as it aims to modernize all its units. As future brigades within the Ninth Circuit's jurisdiction are directed by Army Headquarters to transform to SBCTs, must the Army analyze relocation of each brigade for a nationwide project that was deemed from the start to entail only "in place" transformation? If so, on what legal basis? The majority opinion does not supply an answer to these important questions. Because the Army's decision to transform units "in place" was not arbitrary and capricious, because the plaintiffs waived their challenges to the Army's SEIS, and because the Army's SEIS evaluated alternatives to full transformation in Hawaii, I would affirm the judgment of the district court.